**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| In re Precision Lighting & Electric, LLC, | ) | Case No. 26-xxxxx |
| | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |
| In re Geise Properties 5, LLC, | ) | Case No. 26-xxxxx |
| | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |

**DEBTORS' JOINT EMERGENCY MOTION FOR ORDERS (I) AUTHORIZING POSTPETITION FINANCING; (II) GRANTING LIENS TO POSTPETITION LENDER; AND (III) SCHEDULING FINAL HEARING**

COMES NOW Precision Lighting & Electric, LLC ("Precision") and Geise Properties 5, LLC ("Geise Properties," and together with Precision, the "Debtors"), as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Chapter 11 Cases"), jointly seeking entry of interim and final orders under sections 105, 361, 362, 364(c) and 364(d) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 9013-1 of the Nebraska Rules of Bankruptcy Procedure (the "Local Rules"): (a) authorizing, but not directing, Debtors to obtain post-petition financing on the terms set forth herein and (b) scheduling a final hearing on the Motion. In support of this motion (the "Motion"), Debtors respectfully represent the following:

**JURISDICTION AND VENUE**

1. On November 11, 2026, (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. This Court has jurisdiction over these cases pursuant to 28 U.S.C. § 1334 and venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. By Nebraska General Rule 1.5 of the United States District Court for the District of Nebraska, the District Court has referred all bankruptcy cases to the Bankruptcy Court for initial determination, as permitted by 28 U.S.C. § 157(a). This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (O), and Debtors consent to entry of a final order by the Court in connection with this motion or application to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

**BACKGROUND**

2. Precision was established in 2006 by Shane Geise. Currently, Precision's operational headquarters is located at 13401 S 234th St., Gretna, NE 68028, which property is leased by Precision and owned by Geise Properties.

3. Geise Properties was formed in 2024 and owns the real property located at 13401 S 234th St., Gretna, NE 68028 (the “Headquarters Property”). In addition to serving as Precision’s operational headquarters, the Headquarters Property is the primary residence of Tara Geise (“Ms. Geise”), who owns and manages both Debtors.

4. Precision employs approximately 60 individuals who perform a wide variety of electric and lighting services ranging from simple residential repair jobs to multi-million dollar commercial projects. As of the date of this filing, Precision has more than 40 active projects with adjusted contract prices aggregating to more than $12,500,000.00, and Precision continues to operate and bid out new jobs in the ordinary course of business. Nevertheless, Precision began to experience cash flow issues. These cashflow issues are the result of two primary facts.

5. First, in 2025, Precision’s former owner was arrested and ultimately incarcerated for matters unrelated to Precision or its operations. Ancillary to this incarceration, a divorce proceeding was commenced, and a decree was entered that, among other things, transferred ownership of Precision and Geise Properties to Ms. Geise. Historically, Ms. Geise did not participate in the operations of Precision, but she has spent the last year stepping into an ownership and operational role. This required a steep learning curve requiring Ms. Geise to not only learn the operations of Precision as a going concern, but also to investigate and understand Precision’s prior operations and financial condition.

6. Second, contemporaneously with the foregoing (and perhaps more importantly), it was ascertained that a now former employee of Precision dramatically underbid several contracts, including two, multimillion dollar projects, resulting in substantial losses to Precision. These losses proved too much to bear and placed a tremendous burden on Precision’s cash flow and borrowing capacity. In turn, Precision began having difficulties paying its operating expenses and suppliers, resulting in a much larger than normal accounts payable debt. Compounding this problem is a difficulty in collecting accounts receivable fast enough to bridge the gap between Precision’s operational expenses and income. This difficulty arises, in part, from customers: (i) not timely, or not at all remitting payments on invoices; and (ii) requiring two party checks between Precision and one or more of its suppliers.

7. Understanding that Precision would not be able to operate in the long term under the circumstances, Debtors explored their options to sell their assets as a going concern garnering interest from several parties. Ultimately, Debtors have reached an agreement to sell their respective assets as a going concern to Copper and Current, LLC (“Copper”). Among other items, the proposed arrangement with Copper requires a sale approved by this Court free and clear of liens, claims and encumbrances under §363(f).

8. More recently, one of Precision’s largest suppliers has sent out, in Precision’s opinion either misleading or incorrect notices of rights to assert construction liens under Neb. Rev. Stat. §52-135[1], to a number of Precision’s customers. These notices, rightly or wrongly sent, have caused additional confusion and collection issues. Debtors therefore found it necessary to file these Chapter 11 Cases to address these issues and to effectuate the proposed sale to Copper.

[1] Which only apply in the matters related to ‘Protected Parties’ as used in the Nebraska construction lien statutes.

9. In the very near future, Debtors will be filing a motion to sell substantially all of their assets to Copper, but Precision requires access to working capital to bridge the gap between income and expenses while the sale process occurs. Copper has agreed to provide Debtors with a debtor-in-possession loan to the extent necessary to fund Precision's ongoing operations subject to the terms of the DIP Agreement defined below. Debtors are therefore seeking financing so that Debtors may maximize value for all creditors and parties in interest. Absent access to working capital, it is likely, if not inevitable, that Precision will be required to shutter its operations, thus endangering Precision's going concern value, the value of the Headquarters Property, and the contemplated sale to Copper.

10. The relief sought in this Motion is critical to ensure that Precision is able to pay ordinary business expenses during the pendency of these Chapter 11 Cases. Absent the ability to obtain funding from Copper on the terms set forth herein, Precision may be forced to cease operating, in which case Debtors' assets and bankruptcy estates will be irreparably harmed to the detriment of not only Debtors, but also all of their creditors.

11. Debtors have also discussed the possibility of obtaining post-petition financing from their primary, prepetition lender, Dayspring Bank (the "Bank"), but the Bank is currently unable to offer Debtors post-petition financing. Accordingly, Debtors believe that they are unable to obtain any other post-petition financing on terms more favorable than those proposed by Copper. As a failure to secure financing would effectively mean the end of these Chapter 11 Cases, Debtors request that the Court grant the relief requested.

## PROPOSED DIP FINANCING SUMMARY

12. Attached hereto as Exhibit A is the Debtor-In-Possession Credit Agreement (hereafter the "DIP Agreement") which describes the conditions under which Copper will agree to provide financing to Debtors (the "DIP Financing"). A proposed interim order approving the DIP Financing (the "Interim Order") is attached hereto as Exhibit B.

13. Below is a summary of the operative terms of the DIP Agreement:

| Material Term | Summary and Location |
|---|---|
| **Borrowers:** | Precision Lighting & Electric, LLC and Geise Properties 5, LLC, each individually and collectively the "Borrower." The Obligations are owed by, and the Post-Petition Liens attach to the property of, both Debtors. **[DIP Agreement, Preamble]** |
| **Lender:** | Copper and Current, LLC. **[DIP Agreement, Preamble]** |
| **Facility and Commitment:** | Revolving credit facility in the maximum principal amount of $300,000.00 (the "Revolving Credit Commitment"), evidenced by a Revolving Credit Note. Amounts repaid may be reborrowed, provided the aggregate outstanding principal does not exceed the Revolving Credit Commitment. **[DIP Agreement §§ 1.1, 2.1(a)–(c)]** |
| **Borrowing Limits:** | Advances are limited to the amount needed solely for the reasonable and |

| Material Term | Summary and Location |
|---|---|
| *Rule 4001(c)(1)(B)* | necessary operational expenses and Bankruptcy Expenses set forth in the Approved Budget. Borrower may submit no more than one advance request per week, and Lender is to fund within a reasonable time after receipt of a request. **[DIP Agreement §§ 2.1(b), 2.2(a)–(c)]**<br>Interim availability pending the Final Hearing: $300,000. |
| **Borrowing Conditions:**<br>*Rule 4001(c)(1)(B)* | Closing conditions: delivery of the executed Revolving Credit Note, Security Agreement and UCC-1, and Deed of Trust from Geise Properties on the Headquarters Property; evidence of insurance; the Approved Budget; and entry of the Interim Order, which must be in full force and effect and not stayed, vacated, reversed, rescinded, or appealed. **[DIP Agreement §§ 3.1, 3.4]**<br>Conditions to each Advance: representations and warranties true and correct in all material respects; no Event of Default or Unmatured Event of Default; the Interim Order (and, after entry, the Final Order) in full force and effect; no change having or reasonably expected to have a Material Adverse Effect; no injunction prohibiting the extension of credit; and the Approved Budget in full force and effect and acceptable to Lender in its sole discretion. **[DIP Agreement §§ 3.2(a)–(g), 3.3]** |
| **Interest Rate:**<br>*Rule 4001(c)(1)(B)* | 10% per annum, computed on an actual/360 basis. **[DIP Agreement § 2.3(a), (c)]**<br>Default Rate: the otherwise applicable rate plus 3.00% (i.e., 13% per annum), accruing from the Event of Default until waived or cured as determined by Lender in its sole discretion, and payable on demand. **[DIP Agreement §§ 1.1, 2.3(b)]** |
| **Fees and Expenses:** | No commitment, origination, or exit fee.<br>Late fee equal to the greater of 5% of the late payment or $25.00 for any payment ten or more days late. **[DIP Agreement § 2.6]**<br>Borrower pays Lender’s reasonable expenses, including attorneys’ fees, audit, inspection, and appraisal fees, relating to the DIP Agreement, the Loans, and the Collateral, to the extent approved by the Bankruptcy Court. Expenses unpaid 30 days after demand bear interest at the Default Rate. **[DIP Agreement § 8.5]** |
| **Maturity Date:**<br>*Rule 4001(c)(1)(B)* | The earliest of (i) January 1, 2027; (ii) entry of a final order approving the Sale; or (iii) the occurrence and continuance of an Event of Default. No Advances are available after the Maturity Date. **[DIP Agreement § 2.1(d)]**<br>Accrued interest is due on the earlier of demand or the Maturity Date; all principal and unpaid interest is due on the Maturity Date. Prepayment is permitted at any time without premium or penalty. Payments apply first to interest, then to principal. **[DIP Agreement § 2.4(a)–(d)]** |
| **Use of Proceeds:** | Normal operating expenses and Bankruptcy Expenses incurred before the Maturity Date, as set forth in the Approved Budget. Bankruptcy Expenses |

| Material Term | Summary and Location |
|---|---|
| | include court fees, U.S. Trustee quarterly fees, and allowed fees of estate and committee professionals, limited to amounts in the Approved Budget. **[DIP Agreement §§ 1.1, 2.5]** |
| **Approved Budget:** | Thirteen-week budget of receipts and disbursements, substantially in the form of Exhibit A, as amended by Borrower and Lender and approved by the Interim or Final Order. Borrower must make disbursements strictly within the Approved Budget and obtain receipts in the budgeted amounts. The DIP Agreement does not provide a permitted variance. **[DIP Agreement §§ 1.1, 5.6, Ex. A]** |
| **Priority and Liens:**<br>*Rule 4001(c)(1)(B)(i)* | Superpriority Claim (§ 364(c)(1)): Subject to the Carve-Out, an allowed superpriority administrative expense claim with priority over all administrative expenses, including those under §§ 503(b) and 507(b) and, upon entry of the Final Order, § 506(c), with recourse to all pre- and postpetition assets and proceeds, excluding Avoidance Actions. The superpriority claim may not exceed the value of Lender's secured claim in the Collateral. **[DIP Agreement § 2.7(a)]**<br><br>Post-Petition Liens:<br>(i) § 364(c)(2): first-priority lien on Precision's unencumbered vehicles identified on Schedule 2.7(b)(i) (the "Certificated Vehicles"). **[DIP Agreement § 2.7(b)(i)]**<br>(ii) § 364(c)(3): junior lien on all property of each Debtor's estate subject to a prepetition lien, including Geise Properties' Headquarters Property described in the Deed of Trust, but excluding titled vehicles and equipment on which a third party has noted a lien. **[DIP Agreement § 2.7(b)(ii)]**<br>(iii) § 364(d): priming lien on all of Borrower's Accounts (as a practical matter, Precision's accounts receivable). **[DIP Agreement § 2.7(b)(iii)]**<br>(iv) Non-debtor collateral: whether or not approved by the Court, non-priming, second-position deeds of trust from non-debtor affiliates Geise Properties 1 LLC (205 Glendale Cir., Gretna), Geise Properties 3 LLC (7528 S. 128th Street, La Vista), and Geise Properties 4 LLC (406 Circle Street, Papillion). [DIP Agreement § 2.7(g)]<br><br>The Post-Petition Liens may not be made subordinate to or pari passu with any other lien or claim and are not subject to preservation for the estate under § 551. **[DIP Agreement § 2.7(c), (f)]** |
| **Carve-Out:** | As defined in the Authorizing Order: (i) fees payable to the Clerk and the U.S. Trustee under 28 U.S.C. § 1930(a), with interest under 31 U.S.C. § 3717; (ii) allowed fees and expenses of estate and committee professionals incurred before delivery of a Carve-Out Trigger Notice, to the extent provided for in the Budget; and (iii) such fees and expenses incurred after delivery of a Carve-Out Trigger Notice, not to exceed $75,000.00. The |

| Material Term | Summary and Location |
|---|---|
| | Carve-Out is senior to the Post-Petition Liens, the superpriority claim, and the Bank's liens (Interim Order ¶ 15). **[DIP Agreement §§ 1.1, 2.7(a)]** |
| **Adequate Protection; Prepetition Claims:** *Rule 4001(c)(1)(B)(ii)–(iii)* | The DIP Agreement does not provide adequate protection or payments on account of prepetition claims, does not roll up prepetition debt, and does not contain stipulations as to the validity, priority, or amount of any prepetition claim or lien. Adequate protection for holders of prepetition liens on Accounts primed under § 364(d) (the Bank): the Bank has consented to the DIP Agreement pursuant to the Interim Order. Copper's lien on the Headquarters Property is junior to the Bank's existing deeds of trust and assignments of rents and does not prime them. |
| **Events of Default:** *Rule 4001(c)(1)(B)* | (a) Failure to pay principal or interest when due (no grace period). **[DIP Agreement § 7.1(a)]**<br>(b) Failure to pay other charges, fees, or Expenses, continuing five days after notice or knowledge (no grace period for amounts due on maturity, acceleration, or demand). **[DIP Agreement § 7.1(b)]**<br>(c) Failure to perform any covenant or to meet any Milestone, continuing ten days after Borrower becomes aware of the failure or receives notice. **[DIP Agreement § 7.1(c)]**<br>(d) Materially false financial information, representations, or warranties. **[DIP Agreement § 7.1(d)–(e)]**<br>(e) Bankruptcy events, including: a Borrower motion or court order for additional § 364(c) or (d) financing or for senior or pari passu liens or superpriority claims; appointment of a trustee, receiver, or examiner; dismissal or conversion; confirmation of a plan not acceptable to Lender in its sole discretion; any challenge to the validity, extent, perfection, or priority of Lender's liens or claims, or any attempt to avoid, set off, or subordinate them; violation of, or the Authorizing Order ceasing to be in effect; the Post-Petition Liens or superpriority claim ceasing to be valid and perfected; and any motion by any Person seeking to exercise rights under § 506(c). **[DIP Agreement § 7.1(f)(i)–(x)]** |
| **Remedies Upon Default:** *Rule 4001(c)(1)(B)* | Subject to the Authorizing Order: acceleration of the Obligations; cessation of Advances (including upon an Unmatured Event of Default); termination of the facility; imposition of the Default Rate; and exercise of UCC and other remedies, including taking possession of Collateral, notifying Account debtors and collecting Accounts directly, requiring Borrower to assemble Collateral, and reducing or modifying the Revolving Credit Commitment. Ten days' notice of a public or private sale of Collateral is deemed reasonable. Lender is not required to accept a cure except as provided in § 7.1 or the Authorizing Order. **[DIP Agreement §§ 2.3(b), 7.1, 7.2, 7.3(a)–(d), 7.4]** |
| **Automatic Stay:** | The DIP Agreement does not itself modify the automatic stay; Lender's |

| Material Term | Summary and Location |
|---|---|
| *Rule 4001(c)(1)(B)(iv)* | remedies are exercisable "subject to the Authorizing Order." The DIP Agreement does not specify a remedy notice period. Stay modification and any notice period: under the Interim Order, the stay is modified to permit the grant and perfection of the liens and implementation of the DIP Documents. Upon an Event of Default, Lender may cease Advances, accelerate, and charge the Default Rate without further order, but may exercise other remedies against the Collateral only after filing and serving notice and the passage of ten business days, during which Debtors may seek an emergency hearing (Interim Order ¶¶ 17–18). **[DIP Agreement § 7.3]** |
| **Milestones:**<br>*Rule 4001(c)(1)(B)(vi)* | (a) Interim Order entered within seven Business Days after the Petition Date. **[DIP Agreement § 5.7(a)]**<br>(b) Final Order entered within 30 days after the Petition Date. **[DIP Agreement § 5.7(b)]**<br>(c) Within ten days after entry of the Interim Order, Borrower must file either (i) a motion to approve bidding procedures and a sale of substantially all assets under § 363 through one sale, or (ii) a motion to approve a § 363 sale of substantially all assets to Lender, in either case in form and substance acceptable to Lender. **[DIP Agreement § 5.7(c)]**<br>(d) By December 28, 2026, the sale of substantially all assets must be closed and a final order approving the sale entered, in form and substance agreeable to Lender (the "Sale"). **[DIP Agreement § 5.7(d)]**<br>Failure to meet a Milestone is an Event of Default after a ten-day cure period. The DIP Agreement contains no deadlines for filing a plan or disclosure statement or for confirmation. **[DIP Agreement § 7.1(c)]** |
| **Credit Bid Right:** | The bidding procedures motion must expressly recognize Lender's right to bid at any sale and to credit bid up to the entire amount due under the Revolving Credit Facility. If the Debtors instead seek a sale to Lender, the sale motion must expressly recognize Lender's right to credit bid up to the entire amount due under the Revolving Credit Facility against the purchase price. **[DIP Agreement § 5.7(c)]** |
| **Limitations on Plan, Financing, and Cash Collateral Rights:**<br>*Rule 4001(c)(1)(B)(v)* | The DIP Agreement does not expressly waive any party's right to file a plan, seek an extension of exclusivity, request use of cash collateral, or obtain credit. However, a Borrower motion for additional § 364(c) or (d) financing, or for senior or pari passu liens or superpriority claims, and confirmation of a plan not acceptable to Lender in its sole discretion, are Events of Default. **[DIP Agreement § 7.1(f)(i), (iv)]** |
| **Perfection and Nonbankruptcy Law:**<br>*Rule 4001(c)(1)(B)(vii)* | The Post-Petition Liens are deemed perfected upon entry of the Authorizing Order without any filing or recording. Subject to entry of the Final Order, any lease, contract, license, or other agreement provision requiring third-party consent to a pledge or transfer is deemed unenforceable as to the Post-Petition Liens. **[DIP Agreement § 2.7(e)]** |

| Material Term | Summary and Location |
|---|---|
| **Limitations on Estate Claims:** *Rule 4001(c)(1)(B)(viii)* | No loan proceeds or Cash Collateral may be used to investigate, prosecute, or contest Lender's claims, liens, or superpriority claim, or to hinder Lender's rights or remedies. Borrower waives claims against Lender's Indemnitees for special, indirect, consequential, or punitive damages. The DIP Agreement contains no release of estate claims against Lender and no challenge period. **[DIP Agreement §§ 2.5, 8.3(c)]** |
| **Indemnification:** *Rule 4001(c)(1)(B)(ix)* | Borrower indemnifies Lender and its directors, officers, employees, agents, and Affiliates against all losses, claims, damages, liabilities, and expenses (including attorneys' fees) arising from the DIP Agreement, the Loans, or the use of proceeds, except to the extent finally determined to result from the Indemnitee's gross negligence or willful misconduct. The indemnity survives payment of the Obligations. **[DIP Agreement § 8.3(b), (d)]** |
| **Section 506(c):** *Rule 4001(c)(1)(B)(x)* | Upon entry of the Final Order, the superpriority claim has priority over claims under § 506(c). Any motion by Borrower or any Person seeking to exercise rights under § 506(c) is an Event of Default. The DIP Agreement does not contain an express § 506(c) waiver. **[DIP Agreement §§ 2.7(a), 7.1(f)(x)]** |
| **Avoidance Actions:** *Rule 4001(c)(1)(B)(xi)* | No lien on Avoidance Actions. The superpriority claim has recourse to all assets and proceeds excluding Avoidance Actions (defined as actions under §§ 544, 545, 547, 548, 550, and 553). **[DIP Agreement §§ 1.1, 2.7(a)–(b)]** |

## <u>RELIEF REQUESTED</u>

14. By this Motion, Debtors request entry of the Interim Order:

a. authorizing Debtors to obtain post-petition financing in the form of the DIP Financing on the terms set forth herein and, more fully, in the DIP Agreement; and

b. pursuant to Bankruptcy Rule 4001, schedule, no earlier than 14 days from the entry of the Interim Order, a hearing (the "Final Hearing") for this Court to consider entry of a final order (the "Final Order") authorizing the DIP Financing, as set forth in this Motion.

## <u>BASIS FOR RELIEF</u>

15. Precision cannot operate without the cash generated from its existing operations and the DIP Financing provided by Copper. These funds are used to meet Precision's weekly payroll obligations, fund the necessary expenses for Precision to provide the goods and services required under its contracts with customers, pay monthly insurance premiums, and pay for other operational expenses. For these reasons, Debtors request the Court authorize Debtors to incur secured debt pursuant to section 364(c) and (d) of the Bankruptcy Code by approving and authorizing Debtors to enter into the DIP Agreement pursuant to the terms set forth therein, granting liens and security

interests to Copper described therein to maintain the operations of Precision's business and preserve the value of Debtors' assets for the benefit of all creditors and parties in interest.

16. Although Precision is the operating entity and the primary user of the DIP Financing, the relief is sought jointly because the DIP Agreement names both Debtors as Borrowers and each Debtor is offering different collateral. Precision will grant Copper a first-priority lien on the Certificated Vehicles, a priming lien on its Accounts, and a junior lien on its other encumbered property. Geise Properties will grant Copper a junior lien on the Headquarters Property, subordinate to the Bank's existing deeds of trust and assignments of rents. Geise Properties benefits directly from the DIP Financing because Precision is Geise Properties' tenant at the Headquarters Property and the proposed sale to Copper includes the assets of both Debtors, so preserving Precision's going concern value also preserves the value of Geise Properties' estate.

17. Approval of the DIP Financing will provide Debtors with additional operating cash such that they will be able to avoid: (a) irreparable harm to Precision's business; (b) depletion of going concern value; and (c) jeopardizing Debtors' ability to maximize value. Accordingly, the timely approval of the relief requested herein on an interim basis is imperative.

18. The Court should authorize Debtors, as an exercise of their sound business judgment, to enter into the DIP Agreement and obtain access to the DIP Financing. Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances that are present in these Chapter 11 Cases, as discussed herein. Courts grant a debtor-in-possession considerable deference when acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g.*, *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) ("Business judgments should be left to the board room and not to this Court"); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a Debtors in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest").

19. Courts emphasize that the business judgment rule is not an onerous standard and may be satisfied "… as long as the proposed action appears to enhance Debtor's estate." *Crystalin, LLC v. Selma Props. Inc. (In re Crystalin, LLC)*, 293 B.R. 455, 463–64 (B.A.P. 8th Cir. 2003) (citation omitted) (emphasis in original, text modifications removed); *see also In re AbitibiBowater*, 418 B.R. 815, 831 (Bankr. D. Del. 2009) (the business judgment standard is "not a difficult standard to satisfy"). Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second

guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [Debtor's] authority under the [Bankruptcy] Code").

20. Debtors' decision to move forward with the DIP Financing following an arms-length negotiation process is well within Debtors' sound business judgment. Specifically, and in the face of insufficient cash on hand, Debtors and their advisors determined that Debtors would require postpetition financing to support Precision's operations and Debtors' chapter 11 activities. Debtors negotiated the DIP Agreement in good faith, at arms-length, and with the assistance of their advisors, and Debtors believe that they have obtained the best financing available. Accordingly, the Court should authorize Debtors' entry into the DIP Agreement, as a reasonable exercise of Debtors' business judgment.

21. Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of the debtors and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) (while many of the terms favored the DIP lenders, "taken in context, and considering the relative circumstances of the parties," the court found them to be reasonable); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. of Escanaba (In re Elingsen McLean Oil Co., Inc.*), 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard" bargains to acquire funds for its reorganization).

22. In exchange for the DIP Financing, Debtors propose to provide Copper with, among other things, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected security interests in and liens on the collateral of each Debtor as described in the DIP Agreement.

23. Section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate *already subject to a lien*, after notice and a hearing, where debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). Accordingly, Debtors may incur "priming" liens under a DIP Financing if either (a) the prepetition secured parties have consented or (b) prepetition secured parties' interests in the Collateral are adequately protected.

24. In order to obtain financing, secured by a priming lien pursuant to Section 364(d), Debtors "must demonstrate that no suitable alternative financing is available from other sources, and that the proposed financing arrangement adequately protects the existing lienholders' interests." *First Sec. Bank & Trust Co. v. Vegt*, 511 B.R. 567, (N.D. Iowa 2014).

25. As further noted by the Iowa District Court, the "first prong of § 364(d) requires a debtor to prove that alternative financing is unavailable…However, a debtor is not required to seek credit from every possible lender before concluding that such credit is unavailable. Rather, a debtor need only show that it has made reasonable efforts to seek other sources of credit." *First Sec. Bank & Trust Co. v. Vegt*, 511 B.R. 567, (N.D. Iowa 2014), *internal citations omitted*. *See also Bray v. Shenandoah*

*Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area).

26. As detailed in the DIP Agreement, Debtors propose to grant a priming lien under §364(d) only as to the Accounts (as defined in the DIP Agreement), and the Bank has consented to such a priming lien. Copper's lien on the Headquarters Property is junior to the Bank's existing liens on that property and does not prime them.

**<u>EMERGENCY AND INTERIM APPROVAL</u>**

27. Emergency relief is warranted under these circumstances. Absent the immediate relief requested herein, Precision will not be able to meet its ongoing payroll obligations and otherwise operate in the ordinary course of business.

28. Bankruptcy Rule 4001(c) governs the procedures for obtaining credit, and provides, in relevant part, "[t]he court may begin a final hearing on the motion no earlier than 14 days after it has been served. If the motion so requests, the court may conduct a preliminary hearing before that 14 day period ends. After a preliminary hearing, the court may authorize obtaining credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(c)(2).

29. Bankruptcy Rule 6003 provides that "[u]nless relief is needed to avoid immediate and irreparable harm, the court must not, within 21 days after the petition is filed, grant an application or motion to: . . . (3) incur any other obligation regarding the property of the estate . . . ." Fed. R. Bankr. P. 6003(a)(3). The Third Circuit Court of Appeals has interpreted the "immediate and irreparable harm" language in the context of preliminary injunctions to mean a continuing harm that cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation. *See Norfolk S. Ry. Co. v. City of Pittsburgh*, 235 Fed. Appx. 907, 910 (3rd Cir. 2007). If Precision is not permitted to continue its ordinary business operations by continuing to pay operating expenses, immediate and irreparable harm will result. Accordingly, Debtors submit that, for the reasons set forth herein, the relief requested herein is consistent with Bankruptcy Rules 4001 and 6003.

30. Accordingly, the Court is empowered to conduct an expedited preliminary hearing on the Motion and authorize the DIP Agreement on an interim basis to the extent necessary to avoid immediate and irreparable harm to Debtors. Debtors seek entry of the Interim Order to enable Precision to operate in the ordinary course and to pay necessary expenses and avoid immediate and irreparable harm to the bankruptcy estates pending a final hearing on the Motion.

**<u>THE AUTOMATIC STAY AND RULE 6004 SHOULD BE MODIFIED ON A LIMITED BASIS</u>**

31. The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit Debtors to: (i) grant the security interests, liens and superpriority claims, and to perform such acts as may be requested to assure the perfection and priority of such security interests

and liens; (ii) permit Copper to exercise all rights and remedies under the DIP Financing; and (iii) implement the terms of the Interim Order.

32. Stay modifications of this kind are ordinary and standard features of post-petition debtor financing facilities and, in Debtors' business judgment, are reasonable and fair under the present circumstances.

33. To implement the foregoing successfully, Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## REQUEST FOR FINAL HEARING

34. Pursuant to Bankruptcy Rule 4001(c), Debtors request that the Court set a date for the Final Hearing as soon as practicable and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

## CONCLUSION

WHEREFORE, Debtors respectfully request that the Court enter an order: (i) granting this Motion on an interim basis; (ii) setting the matter for a final hearing on an expedited basis; (iii) authorizing, but not directing, Debtors to obtain post-petition financing on the terms set forth in the DIP Agreement; (iv) granting Copper and Current, LLC post-petition liens and super-priority claims as described in the DIP Agreement and herein; and (v) granting any other relief at equity or law this Court deems necessary.

Respectfully submitted,

**Precision Lighting & Electric, LLC and Geise Properties 5, LLC, Debtors.**

By: */s/ Patrick R. Turner*

TURNER LEGAL GROUP, LLC
Patrick Turner (NE Bar No. 23461)
9375 Burt Street, #200
Omaha, Nebraska 68114
Telephone: (402) 690-3675
pturner@turnerlegalomaha.com
Proposed Counsel for Debtors.

IN THE MATTER OF
Precision Lighting & Electric, LLC, et al.
Case No. BK 26-xxxxx
Motion to Borrow

# EXHIBIT A – DIP AGREEMENT

# DEBTOR-IN-POSSESSION CREDIT AGREEMENT

THIS DEBTOR-IN-POSSESSION CREDIT AGREEMENT (as the same may from time to time be amended, restated, modified or otherwise supplemented, this "Agreement") is dated this __ day of November 2026 by and among Precision Lighting & Electric, LLC, a Nebraska limited liability company ("Precision") and Geise Properties 5, LLC, a Nebraska limited liability company ("Geise Properties") and debtors and debtors-in-possession (each of Precision and Geise Properties individually and collectively, and together with their successors and assigns, the "Borrower"), and Copper & Current, LLC, a Nebraska limited liability company (together with its successors and assigns, the "Lender").

## RECITALS

WHEREAS, Borrower has filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (as hereinafter defined) in the United States Bankruptcy Court for the District of Nebraska (the "Bankruptcy Court"), and plans to continue to manage its business and possess its assets as debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, Borrower has requested that Lender provide post-petition debtor-in-possession financing of up to $300,000.00 via (a) a Three Hundred Thousand and 00/100 Dollar ($300,000.00) "Revolving Credit Facility" more particularly described and defined herein;

WHEREAS, the Borrower has agreed to secure the post-petition revolving credit facility provided for herein with a first priority post-petition priming lien on certain of Borrower's assets under 11 U.S.C. §364(d), and Super-Priority Administrative Expense Claim (as hereinafter defined) to the extent of all amounts due to Lender from Borrower under the Revolving Credit Facility; and

WHEREAS, Lender is willing to provide the debtor-in-possession financing on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, for and in consideration of Lender making the loans hereunder, the recitals set forth above, which are incorporated into the Agreement by this reference, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is agreed as follows:

## AGREEMENT

### SECTION 1. DEFINITIONS AND INTERPRETATION

**1.1. Terms Defined. As used in this Agreement, the following terms have the following respective meanings:**

"Account" means a right to payment of a monetary obligation, whether or not earned by performance, arising out of the sale of goods or production of services, in which Borrower now has or hereafter acquires any right.

"Advance" means any monies advanced or credit extended as a Loan to or for the benefit of Borrower by Lender as described in Section 2.1 of this Agreement.

"Affiliate" means, with respect to any specified Person, (a) any Person which, directly or indirectly, controls, is controlled by or is under common control with, the specified Person, and (b) any director or officer (or, in the case of a Person which is not a corporation, any individual having analogous powers) of the specified Person or of a Person who is an Affiliate of the specified Person within the meaning of the preceding clause (a). For purposes of the preceding sentence, "control" of a Person shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, or direct or indirect ownership (beneficially or of record) of, or direct or indirect power to vote, five percent (5%) or more of the equity interests of such Person.

"Agreement" has the meaning set forth in the introductory paragraph of this Agreement.

"Approved Budget" means the projection for receipts and revenues and budget for cash expenditures of Borrower over a thirteen (13) week period, substantially in the form of Exhibit A attached hereto (as amended from time to time by each of Borrower and Lender) that is approved by any Interim or Final Order.

"Authorized Representative" means any director or officer of Borrower authorized to sign on Borrower's behalf post-petition.

"Authorizing Order" means the Interim Order until such time as the Final Order is entered, final and non-appealable, after which time it means the Final Order.

"Avoidance Actions" means an action originating under the authority of and pursuant to Sections 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code.

"Bankruptcy Case" means the Chapter 11 bankruptcy proceeding filed in the District of Nebraska by Borrower in the Bankruptcy Court.

"Bankruptcy Code" means Title 11 of the United States Code.

"Bankruptcy Court" has the meaning set forth in the recitals of this Agreement, as amended from time to time.

"Bankruptcy Expenses" means (a) all required bankruptcy filing and related fees due to the Bankruptcy Court from Borrower, (b) all quarterly fees due to the bankruptcy administrator or government from Borrower under 28 U.S.C. § 1930(a)(6) and (c) all fees and expenses of Bankruptcy Professionals, in each case, to the extent incurred post-petition and prior to the Maturity Date and approved by an interim or final order of the Bankruptcy Court and limited to the amounts set forth in the Approved Budget.

"Bankruptcy Professionals" means any attorneys, accountants and other professionals retained in the Bankruptcy Case by Borrower or any official committee of unsecured creditors pursuant to Sections 327, 328, 330, or 331 of the Bankruptcy Code.

"Borrower" has the meaning set forth in the introductory paragraph of this Agreement.

"Business Day" means any day other than a Saturday, Sunday or any day on which banking institutions in Omaha, Nebraska are permitted or required by law, executive order or governmental decree to remain closed or a day on which Lender is closed for business.

"Capitalized Lease" means a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

"Carve-Out" has the meaning ascribed to such term in the Authorizing Order.

"Cash Collateral" means Borrower's "cash collateral", as such term is defined in Section 363(a) of the Bankruptcy Code.

"Closing" has the meaning set forth in Section 3.4 hereof.

"Closing Date" has the meaning set forth in Section 3.4 hereof.

"Collateral" means the property described in the Section 2.7(b) that now or hereafter secures the payment and performance of any of the Obligations pursuant to any of the Loan Documents, the Authorizing Order or otherwise.

"Deed of Trust" has the meaning ascribed to it in Section 3.1(c) of this Agreement.

"Default Rate" means the rate of interest otherwise applicable on the Revolving Credit Facility plus three percent (3.00%).

"Event of Default" has the meaning set forth in Section 7.1 hereof.

"Expenses" has the meaning set forth in Section 8.5 hereof.

"Final Order" means the Final Order of the Bankruptcy Court in a form and substance approved by Lender in Lender's sole discretion, authorizing Borrower to obtain final credit as provided for herein, and granting Lender the Super-Priority Administrative Expense Claim and Post-Petition Liens.

"GAAP" means generally accepted accounting principles, consistently applied.

"Hazardous Substance" means any asbestos, urea-formaldehyde, polychlorinated biphenyls, nuclear fuel or material, chemical waste, radioactive material, explosives, known carcinogens, petroleum products and by-products and other dangerous, toxic or hazardous pollutants, contaminants, chemicals, materials or substances listed or identified in, or regulated by, any Environmental Laws.

"Interim Order" means the Interim Order of the Bankruptcy Court in a form and substance approved by Lender in Lender's sole discretion, authorizing Borrower to obtain interim credit as provided for herein, and granting Lender the Super-Priority Administrative Expense Claim and Post-Petition Liens.

"Lender" has the meaning set forth in the introductory paragraph of this Agreement.

"Lien" means any mortgage, pledge, security interest, lien (statutory or otherwise), charge, encumbrance, hypothecation, assignment, deposit arrangement or other arrangement having the practical effect of the foregoing or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any Capitalized Lease having the same economic effect as any of the foregoing).

"Loan Documents" means this Agreement, the Revolving Credit Note, the Security Agreement, the UCC-1 Financing Statement, the Deed of Trust, and any other agreements, instruments, documents and certificates executed and/or delivered in connection with this Agreement, as each may from time to time be amended, restated, modified or otherwise supplemented.

"Loans" means the Revolving Credit Loans. Each of the foregoing is referred to herein as a "Loan".

"Material Adverse Effect" means (a) a material adverse change in the business, assets, operations or condition, financial or otherwise, of Borrower or (b) a material impairment in the perfection or priority of Lender's Lien in the Collateral or in the value of the Collateral.

"Maturity Date" has the meaning set forth in Section 2.1.(d) hereof.

"Milestones" has the meaning set forth in Section 5.7 hereof.

"Obligations" means all now existing or hereafter arising loans, advances, liabilities, debts, obligations, covenants and duties of payment or performance of every kind, matured or unmatured, direct or contingent, owing, arising, due or to become due, or payable to Lender, by or from Borrower, in each case, to the extent arising out of this Agreement, any other Loan Document, any other agreement or otherwise including, without limitation, all obligations to repay principal of and interest on Loans, all obligations to pay principal, interest, fees, costs, charges, Expenses and any other sums chargeable to Borrower under the Loan Documents, any other agreement or otherwise, whether or not evidenced by any note or other instrument.

"Person" means any individual, corporation, partnership, limited partnership, limited liability company, association, trust, unincorporated organization, joint venture, court or government or political subdivision or agency thereof, or other entity.

"Petition Date" means the date on which the Borrower files a Chapter 11 proceeding in the Bankruptcy Court.

"Post-Petition Liens" has the meaning set forth in Section 2.7(a) hereof.

"Revolving Credit Commitment means an amount equal to Three Hundred Thousand and 00/100 Dollars ($300,000.00) of post-petition credit.

"Revolving Credit Facility" has the meaning set forth in Section 2.1.(a) hereof.

"Revolving Credit Loans" has the meaning set forth in Section 2.1.(b) hereof.

"Revolving Credit Note" has the meaning set forth in Section 2.1.(c) hereof.

"Security Agreement" has the meaning set forth in Section 3.1.(b) hereof.

"Super-Priority Administrative Expense Claim" has the meaning set forth in Section 2.7(a) hereof.

"Transfer" means one or more sales, transfers or assignments by Lender to a third party of notes evidencing obligations to repay secured or unsecured loans owned by Lender.

"Unmatured Event of Default" means an event which with the passage of time, giving of notice or both, would become an Event of Default.

**1.2. Matters of Construction. The terms "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or subdivision. Any pronoun used shall be deemed to cover all genders. Wherever appropriate in the context, terms used herein in the singular also include the plural and vice versa. All references to statutes and related regulations shall include any amendments of same and any successor statutes and regulations. Unless otherwise provided, all references to any instruments or agreements to which Lender is a party including, without limitation, references to any of the Loan Documents, shall include any and all modifications or amendments thereto and any and all extensions or renewals thereof.**

**1.3. Accounting Principles. Where the character or amount of any asset or liability or item of income or expense is required to be determined or any consolidation or other accounting computation is required to be made for the purposes of this Agreement, this shall be done in accordance with GAAP, to the extent applicable, except as otherwise expressly provided in this Agreement.**

## SECTION 2. THE REVOLVING CREDIT FACILITY

### 2.1. Description.

(a) Subject to the other terms and conditions of this Agreement, Lender hereby agrees to make available to Borrower a total revolving credit in the amount of up to Three Hundred Thousand and 00/100 Dollars ($300,000.00) consisting of a Three Hundred Thousand and 00/100 Dollar ($300,000.00) revolving credit facility (the "Revolving Credit Facility").

(b) The Revolving Credit Facility permits Advances to be extended by Lender to or for the benefit of Borrower until the Maturity Date in the form of revolving credit loans (the "Revolving Credit Loans") consisting of Advances used to finance Borrower's bankruptcy case. The aggregate outstanding principal amount of all Revolving Credit Loans, at any time, shall not exceed the Revolving Credit Commitment. Subject to this limitation, the aggregate outstanding principal amount of all Revolving Credit Loans may fluctuate from time to time, through repayments and reborrowing. The Obligations of Borrower under the Revolving Credit Facility shall at all times be absolute and unconditional.

(c) At the Closing, Borrower shall duly execute and deliver to Lender the Revolving Credit Note made payable to the order of Lender in the principal amount of the Revolving Credit Commitment (as the same may be amended, restated, modified, supplemented, replaced or refinanced from time to time, the "Revolving Credit Note"). The Revolving Credit Note shall evidence Borrower's absolute and unconditional obligation to repay Lender for all Loans made by Lender under the Revolving Credit Facility, with interest as herein and therein provided. Each and every Advance under The Revolving Credit shall be recorded and evidenced by the Lender's internal records which shall be determinative. The Revolving Credit Note shall be substantially in the form of Exhibit B attached hereto.

(d) The term of the Revolving Credit Facility shall expire on the earlier of (i) January 1, 2027; (ii) a final order entered by the Bankruptcy Court approving the Sale; or (iii) the occurrence and continuance of an Event of Default under this Agreement or the other Loan Documents (the "Maturity Date"). After the Maturity Date, no further Advances under the Revolving Credit Facility shall be available from Lender.

**2.2. Funding Procedures.**

(a) Borrower may request that Lender provide an advance during normal bank business hours Monday through Friday, provided no more than one request shall be delivered to Lender in any week.

(b) Any Advance to Borrower under the Revolving Credit Facility shall be limited to the amount needed solely for the reasonable and necessary operational and Bankruptcy Expenses set forth in the Approved Budget.

(c) Subject to the terms and conditions of this Agreement and so long as no Event of Default or Unmatured Event of Default has occurred hereunder, Lender shall make Advances to Borrower under the Revolving Credit Facility within a reasonable time after Lender's receipt of request for such advance.

**2.3. Interest.**

(a) Each Loan shall bear interest on the outstanding principal amount thereof from the date made until such Loan is paid in full at a base interest rate of 10%. Borrower agrees to pay interest on the unpaid principal amount of each Loan from time to time outstanding hereunder at the rate of interest per annum set forth in the Revolving Credit Note applicable thereto.

(b) If any Event of Default shall occur, the rate of interest applicable to Loans then outstanding shall be the Default Rate. The Default Rate shall apply from the date of the Event of Default until the date such Event of Default is waived or cured, as determined by Lender in its sole discretion, and interest accruing at the Default Rate shall be payable on demand.

(c) Interest shall be computed for the actual number of days elapsed on the basis of a year consisting of three hundred sixty (360) days, including the date a Loan is made and excluding the date such Loan or any portion thereof is paid or prepaid. This calculation method results in a higher effective rate than the numeric interest rates stated in the Revolving Credit Note applicable thereto.

(d) All contractual rates of interest chargeable on any outstanding Loan shall continue to accrue and be paid even after default, maturity, acceleration or the happening of any similar event or occurrence.

(e) In no contingency or event whatsoever shall the aggregate of all amounts deemed interest hereunder and charged or collected pursuant to the terms of this Agreement exceed the highest rate of interest permissible under applicable law. In the event that any court of competent jurisdiction determines Lender has charged or received interest hereunder in excess of the highest applicable rate of interest, Lender may, in its sole discretion, apply and set off such excess interest received by Lender against other Obligations due or to become due and such rate of interest shall automatically be reduced to the maximum rate of interest permitted by such law.

**2.4. Payments.**

(a) All accrued interest due on the Revolving Credit Loan shall be due and payable on the earlier of demand or the Maturity Date.

(b) The entire outstanding principal balance of the Revolving Credit Loans, together with all unpaid accrued interest thereon, shall be due and payable on the Maturity Date.

(c) Borrower may prepay, without premium or penalty, all or any part of the principal of the Loans at any time.

(d) All payments and prepayments shall be applied first to unpaid interest, second to the principal of the Loans (in such order as determined by Lender in its sole discretion). Except as otherwise provided herein, all payments of principal, interest, fees or other amounts payable by Borrower hereunder shall be remitted to Lender in immediately available funds and in lawful money of the United States of America not later than 2:30 p.m. Central time, on the day due, at Lender's principal office in Omaha, Nebraska or at such other address as may be designated by Lender in writing. Whenever any payment is stated as due on a day

which is not a Business Day, the maturity of such payment shall be extended to the next succeeding Business Day and interest shall continue to accrue during such extension.

**2.5. Use of Proceeds. The proceeds of the Revolving Credit Loan shall be used exclusively to finance normal operating expenses and Bankruptcy Expenses incurred prior to the Maturity Date. No part of the proceeds of the Loans under this Agreement, or the Cash Collateral shall be used (i) to investigate or prosecute, or for proceedings to contest, (A) the claims and Obligations of Lender under this Agreement, (B) the security interests and Liens in favor of Lender that secure the Obligations under this Agreement or (C) the Super-Priority Administrative Expense Claim or Post-Petition Liens or (ii) to prevent, hinder or delay any of Lender's rights or remedies arising under this Agreement.**

**2.6. Late Fees.** If any payment hereunder is ten (10) days or more late, Borrower shall owe Lender a fee equal to the greater of (i) five percent (5%) of such payment or (ii) Twenty-Five Dollars ($25.00).

**2.7. Super-Priority Administrative Expense Claim and Post-Petition Liens.**

(a) Super Priority Administrative Expense: Subject to entry and terms of the Authorizing Order, all of the Obligations, subject to the Carve-Out, shall pursuant to Section 364(c)(1) of the Bankruptcy Code and the Authorizing Order, constitute an allowed super-priority administrative expense claim against Borrower (without the need to file any proof of claim) with priority over any and all claims against Borrower, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims arising under Sections 105, 326, 328, 330, 331, 363, 364(c)(1), 365, 503(a), 503(b), 506(c) (upon entry of the Final Order), 507(a), 507(b), 507(d), 726, 1113 or 1114 of the Bankruptcy Code (including any adequate protection obligations), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment (the "Super-Priority Administrative Expense Claim"), which allowed Super-Priority Administrative Expense Claim shall for purposes of Section 1129(a)(9)(A) of the Bankruptcy Code be considered an administrative expense allowed under Section 503(b) of the Bankruptcy Code, and shall be payable from and have recourse to all pre- and post-petition assets and Collateral of Borrower, whether existing on the Petition Date or thereafter acquired, and all proceeds thereof (excluding Avoidance Actions), subject only to the Carve-Out. The Super-Priority Administrative Expense Claim shall be entitled to the full protection of Section 364(e) of the Bankruptcy Code in the event the Authorizing Order or any provision thereof is vacated, reversed, amended or otherwise modified, on appeal or otherwise. Notwithstanding any provision in this Agreement to the contrary, the amount of the Super-Priority Administrative Expense Claim shall not exceed the value of Lender's secured claim in the Collateral;

(b) Collateral: In order to secure repayment of the Obligations hereunder:

(i) pursuant to Sections 361, 362, and 364(c)(2) of the Bankruptcy Code, the Loan Documents and the Authorizing Order, the Obligations shall be secured by a valid, binding, perfected, continuing, enforceable, non-avoidable first position Lien on the unencumbered vehicles identified on Schedule 2.7(b)(i) attached hereto (the "Certificated Vehicles");

(ii) pursuant to Sections 361, 362, and 364(c)(3) of the Bankruptcy Code, the Loan Documents and the Authorizing Order, the Obligations shall be secured by a valid, binding, perfected, continuing, enforceable, non-avoidable junior Lien on all property of Borrower's estate that is secured by a prepetition Lien including, without limitation: (1) a junior Lien on the real estate owned by Geise

Properties 5, LLC as described in the Deed of Trust; but (2) excluding any vehicles or equipment for which a certificate of title exists and on which any third party has notated a lien thereon.

(iii) pursuant to Section 361, 362, and 364(d) of the Bankruptcy Code, the Loan Documents and the Authorizing Order, the Obligations shall be secured by a valid, binding, perfected, continuing, enforceable, non-avoidable priming security interest in and Lien on all Borrower's Accounts.

the forgoing shall be referred to collectively as the "Post-Petition Liens".

(c) Except as provided for in this Agreement or the Authorizing Order, the Post-Petition Liens shall not at any time be (i) made subject or subordinate to, or made pari passu with, any other Lien or claim existing as of the Petition Date, or created under Sections 363 or 364 of the Bankruptcy Code or otherwise, or (ii) avoidable or subject to preservation for the benefit of Borrower's estate under Section 551 of the Bankruptcy Code.

(d) Upon (and at all times after) the entry, and subject to the terms, of the Authorizing Order, the Authorizing Order and the Loan Documents are sufficient to provide the Super-Priority Administrative Expense Claim and Post-Petition Liens.

(e) Pursuant to and in accordance with the Authorizing Order and the Loan Documents, the Post-Petition Liens shall be deemed fully perfected Liens, effective and perfected upon the date of the Authorizing Order without the necessity of execution by Borrower of mortgages, security agreements, pledge agreements, financing agreements, financing statements or other agreements or instruments, such that no additional steps need be taken by Lender to perfect such interests. Subject to notice of hearing and entry of the Final Order, any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document or other instrument or agreement that requires the consent or approval of one or more landlords, licensors or other parties in order for Borrower to pledge, grant, mortgage, sell, assign or otherwise transfer any fee or leasehold interest or the proceeds thereof or other Collateral, is and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code, and shall have no force or effect with respect to the transactions granting Lender the Post-Petition Liens on such fee, leasehold or other interest or other Collateral or the proceeds of any assignment, sale or other transfer thereof.

(f) Pursuant to and in accordance with the Authorizing Order and the Loan Documents, the Super-Priority Administrative Expense Claim, Post-Petition

Liens and other rights and remedies granted to Lender shall continue in the Bankruptcy Case, and such Super-Priority Administrative Expense Claim and Post-Petition Liens shall maintain their enforceability and priority until all the Obligations have been indefeasibly paid in full in cash and completely satisfied in accordance with this Agreement.

(g) In addition, to Super-Priority Administrative Expense Claim and the Post-Petition Liens, and whether or not the Bankruptcy Court can or will enter an order approving the same, Lender will be granted duly authorized and authenticated non-priming, second position deeds of trust of the following real estate:

- 7528 S. 128th Street, La Vista, NE 68138, legally described as Lot 579 Millard Highlands South Replat II, Sarpy County, Nebraska, and owned by Geise Properties 3 LLC;
- 205 Glendale Cir., Gretna, NE 68028, legally described as Lot 69 North Park, Sarpy County, Nebraska, and owned by Geise Properties 1 LLC; and
- 406 Circle Street, Papillion, NE 68046, legally described as Lot 3 Papillion Heights, Sarpy County, Nebraska, and owned by Geise Properties 4 LLC.

**SECTION 3. CLOSING AND CONDITIONS PRECEDENT TO ADVANCES**

Closing under this Agreement and the making of each Advance are subject to the satisfaction or waiver of the following conditions precedent (all documents to be in form and substance satisfactory to Lender):

**3.1. Conditions Precedent to Closing. Prior to the Closing, Borrower shall have delivered to Lender the following each in a form and substance acceptable to Lender in its sole discretion:**

(a) A duly and fully executed Revolving Credit Note.

(b) A duly and fully executed security agreement by Borrower (as the same may from time to time be amended, restated, modified or otherwise supplemented, the "Security Agreement") and UCC-1 Financing Statement. The Security Agreement, UCC-1 Financing Statement and Authorizing Order shall upon entry of the Authorizing Order secure the Obligations and create following entry of an Authorizing Order the Post-Petition Liens.

(c) A duly and fully executed deed(s) of trust with respect to the real property (as the same may from time to time be amended, restated, modified or otherwise supplemented, the "Deed of Trust"). The Deed of Trust, upon entry of the Authorizing Order, shall secure the Obligations and create a junior priority lien on the real property.

(d) Each instrument, document and agreement required to be executed under any provision of this Agreement or any other Loan Document.

(e) Satisfactory evidence of "all risk" property insurance coverage on Borrower's Collateral and general liability, business interruption, auto liability, worker's compensation and other insurance of Borrower, acceptable to Lender.

(f) The Approved Budget, in form and substance satisfactory to Lender.

(g) The Interim Order shall have been entered by the Bankruptcy Court and shall be in full force and effect and shall not have been stayed, vacated, reversed or rescinded and any appeal of such order shall not have been timely filed. Borrower shall be in compliance in all respects with the Interim Order.

(h) All other instruments, certificates, documents, information and reports reasonably required or requested to be executed and/or delivered by Borrower in the sole discretion of Lender.

**3.2. <u>Conditions Precedent to Advances</u>. Lender's obligation to make Advances shall be subject to the satisfaction of each of the following conditions:**

(a) All representations and warranties of Borrower in this Agreement and the other Loan Documents shall be deemed reaffirmed as of the making of such Advance and shall be true, correct and complete in all material respects both before and after giving effect to such Advance (except for those representations and warranties which specifically relate to an earlier date, in which case such representations and warranties shall be true, correct and complete as of such earlier date); provided, however, that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof; and provided, further that those representations and warranties expressly referring to a specific date shall be true, accurate and complete in all material respects as of such date.

(b) No Event of Default or Unmatured Event of Default shall have occurred and be continuing, Borrower shall be in compliance with this Agreement and the other Loan Documents and Borrower shall be deemed to have certified such matters to Lender.

(c) The Interim Order and, following entry of the Final Order, the Final Order, shall be in full force and effect, and shall not have been stayed, vacated, reversed or rescinded and any appeal of such order shall not have been timely filed.

(d) Since the Closing Date, there shall have been no change that has had or could reasonably be expected to have a Material Adverse Effect.

(e) No injunction, writ, restraining order or other order of any nature prohibiting, directly or indirectly, the extending of credit hereunder shall have been issued by any court of competent jurisdiction against Borrower, Lender or any of their Affiliates and remain in force.

(f) The Approved Budget shall be in full force and effect and acceptable to Lender in Lender's sole discretion.

(g) Borrower shall have taken such other actions, including the delivery of instruments, documents and agreements, as Lender may reasonably request.

**3.3. Compliance with this Agreement. Borrower shall have performed and complied with all agreements, covenants and conditions contained herein including, without limitation, the provisions of Sections 5 and 6 hereof, which are required to be performed or complied with by Borrower before or at the Closing Date and as of the date of each Advance.**

**3.4. Closing. Subject to the conditions of this Section 3 and the other terms and conditions of this Agreement, the Revolving Credit Facility shall be made available to Borrower on the date (the "Closing Date") this Agreement is duly executed and delivered to Lender and all of the conditions contained in Section 3.1 hereof are satisfied or waived (the "Closing").**

**3.5. Non-Waiver of Rights. By completing the Closing hereunder, or by making Advances hereunder, Lender does not thereby waive a breach of any representation, warranty or covenant made by Borrower hereunder or under any agreement, document or instrument delivered to Lender or otherwise referred to herein, and any claims and rights of Lender resulting from any breach or misrepresentation by Borrower are specifically reserved by Lender.**

## SECTION 4. REPRESENTATIONS AND WARRANTIES

To induce Lender to complete the Closing and make Advances, Borrower represents and warrants to Lender that:

### 4.1. Organization, Powers, Authorization, and Enforceability.

(a) Borrower is duly organized and validly existing under the laws of the state of its organization, has lawful power and authority to engage in the business it conducts and is qualified to do business and validly existing or in good standing, as applicable, in each state and other jurisdiction where the nature and extent of its business requires qualification, except where the failure to so qualify could not have a Material Adverse Effect.

(b) Borrower has all requisite power and authority to enter into and perform this Agreement and the other Loan Documents and to incur the

Obligations herein provided for and has taken all proper and necessary action to authorize the execution, delivery and performance of this Agreement and the other Loan Documents.

(c) This Agreement and the other Loan Documents, when executed and delivered, will be legal, valid and binding upon Borrower, and enforceable against Borrower, in accordance with their respective terms, except to the extent enforceability may be limited by applicable bankruptcy, insolvency or similar laws affecting creditors' rights generally and by general principles of equity.

**4.2. No Conflicts. The execution, delivery and performance of this Agreement, the other Loan Documents and all related agreements and each document required by any provision hereof by Borrower will not violate any law, government rule or regulation, violate the organizational or governing documents and agreements of Borrower or violate or result in a default of (immediately or with the passage of time) any contract, agreement or instrument to which Borrower is a party, or by which Borrower or its Collateral is bound. Borrower is not in violation of nor has it knowingly caused any Person to violate any term of any agreement or instrument to which it is a party or by which it or its Collateral may be bound, which violation could reasonably be expected to have a Material Adverse Effect. Borrower is not in violation of its organizational or governing documents and agreements.**

**4.3. Governmental Approval. Neither the nature of Borrower or of Borrower's business or Collateral, nor any relationship between Borrower and any other Person, nor any circumstance affecting Borrower in connection with the issuance or delivery of any Loan Document, is such as to require a consent, approval or authorization of, or filing, registration or qualification with, any governmental authority on the part of Borrower in connection with the execution and delivery of this Agreement or the other Loan Documents, except for filings and recordings for collateral security purposes.**

**4.4. Insurance. All premiums due in respect of all insurance maintained by Borrower or with respect to its Collateral have been paid.**

**4.5. Compliance with Laws. Borrower is not in violation of, has not received written notice that it is in violation of, nor has it knowingly caused any Person to violate, any applicable statute, regulation or ordinance of the United States of America, or of any state, city, town, municipality, county or of any other jurisdiction, or of any agency, or department thereof (including without limitation, environmental laws and regulations), which violation could reasonably be expected to have a Material Adverse Effect.**

**4.6. Labor Matters. There are no strikes, lockouts or slowdowns against Borrower pending or, to the knowledge of Borrower, threatened. The**

**hours worked by and payments made to employees of Borrower have not been in violation of the Fair Labor Standards Act or any other applicable federal, state, local or foreign law dealing with such matters. All payments due from Borrower, or for which any claim may be made against Borrower, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of Borrower.**

**4.7. Title to Collateral. Borrower has good and marketable title to its Collateral. Borrower's Collateral is not subject to any right of first refusal, right of first offer, option to purchase or lease.**

**4.8. Intellectual Property. Borrower owns, licenses or possesses the right to use all of the trademarks, service marks, trade names, domain names, copyrights, patents, patent rights, licenses, technology, software, know-how, database rights, rights of privacy and publicity and other intellectual property rights (collectively, "IP Rights") that are necessary for the operation of its business as currently conducted, and, without infringement of the rights of any Person. The operation of the business of Borrower as currently conducted does not infringe upon, misuse, misappropriate or violate any IP Rights held by any Person. No claim or litigation regarding any IP Rights is pending or, to the knowledge of Borrower, threatened against Borrower which, if adversely determined, could reasonably be expected to have a Material Adverse Effect.**

**4.9. Environmental Compliance. Borrower has obtained all permits, licenses and other authorizations which are required under federal, state and local laws and regulations relating to emissions, discharges, releases of pollutants, contaminants, hazardous or toxic materials, or wastes into ambient air, surface water, ground water or land, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of pollutants, contaminants or hazardous or toxic materials or wastes ("Environmental Laws") at its facilities or in connection with the operation of its facilities. Borrower and all activities of Borrower, at its facilities, comply in all material respects with all Environmental Laws and with all material terms and conditions of any required permits, licenses and authorizations applicable to such Person with respect thereto. Borrower is in compliance in all material respects with all limitations, restrictions, conditions, standards, prohibitions, requirements, obligations, schedules and timetables contained in Environmental Laws or contained in any plan, order, decree, judgment or notice of which Borrower is aware. Borrower is not aware of, nor has Borrower received notice of, any events, conditions, circumstances, activities, practices, incidents, actions or plans which may interfere with or prevent continued compliance in all material respects with, or which may give rise to any liability under, any Environmental Laws.**

## SECTION 5. BORROWER'S AFFIRMATIVE COVENANTS

Borrower covenants that until all of the Obligations are paid and satisfied in full under this Agreement:

### 5.1. Business Conducted, Financial Records and Existence and Rights.

Subject to Borrower's duties and obligations under the Bankruptcy Code

(a) Borrower shall continue in the primary business presently engaged in by it, it being agreed that Borrower may engage in businesses reasonably related to its primary business.

(b) Borrower shall keep current and accurate books of records and accounts in which full and correct entries will be made of all of its business transactions, and will reflect in its financial statements adequate accruals and appropriations to reserves, all in accordance with GAAP. Borrower shall provide written notice to Lender promptly upon any change to its fiscal year end date.

(c) Borrower shall do (or cause to be done) all things reasonably necessary to preserve and keep in full force and effect its legal existence, rights and franchises.

### 5.2. Maintenance of Insurance.

(a) Borrower shall keep its business and the Collateral insured for such risks, in such amounts, with such deductibles and with such insurers as are customarily used by companies operating in the same industry as Borrower or which Borrower has historically used (and which is reasonably acceptable to Lender).

(b) Borrower shall maintain, or cause to be maintained, general liability, business interruption, auto liability, worker's compensation and other insurance in such amounts, with such deductibles and with such insurers as are customarily used by companies operating in the same industry as Borrower or which Borrower has historically used (and which is reasonably acceptable to Lender).

(c) The policies of all such insurance shall contain standard lender loss payable and additional insured clauses issued in favor of Lender pursuant to which all losses thereunder shall be paid to Lender as Lender's interests may appear. Such policies shall expressly provide that the requisite insurance cannot be materially altered or canceled without thirty (30) days prior written notice to Lender and shall insure Lender notwithstanding the act or neglect of the insured. Upon the request of Lender, Borrower shall furnish Lender with insurance

certificates certified as true and correct and being in full force and effect or such other evidence of insurance as Lender may require. Such insurance certificates shall name Lender as loss payee and as additional insured. In the event Borrower fails to procure or cause to be procured any such insurance or to timely pay or cause to be paid the premium(s) on any such insurance, Lender may do so for Borrower, but Borrower shall continue to be liable for the same. Borrower hereby appoints Lender as its attorney-in-fact, exercisable at Lender's option, to endorse any check which may be payable to Borrower in order to collect the proceeds of such insurance.

5.3. **Compliance with Laws.** Borrower shall be in compliance with any and all laws, ordinances, governmental rules and regulations, and court or administrative orders or decrees to which it or its Collateral is subject, whether federal, state or local (including, without limitation, environmental or environmental-related laws, statutes, ordinances, rules, regulations and notices) and shall obtain and maintain any and all licenses, permits, franchises, certificates or other governmental authorizations necessary to the ownership of its Collateral and to the conduct of its businesses.

5.4. Payment of Obligations, Taxes and Claims. **On a post-Petition Date basis, Borrower shall pay, before they become delinquent, all debts, obligations, taxes, assessments, governmental charges, levies and claims imposed upon it or upon its Collateral, except for those being contested in good faith with due diligence by appropriate proceedings and for which adequate reserves are maintained in accordance with GAAP.**

5.5. Maintenance of Property / Inspection. **Borrower shall keep and maintain its Collateral in good working order and condition, ordinary wear and tear excepted. Borrower shall, during regular business hours upon reasonable advance notice, permit any of Lender's officers or other representatives to visit and inspect Borrower's Collateral, to examine and audit all of Borrower's books of account, records, reports and other papers, to make copies and extracts therefrom and to discuss its affairs, finances and accounts with the shareholders, directors, officers, employees, Affiliates and independent certified public accountants of Borrower.**

**5.6. Approved Budget.** Borrower shall conduct its operations and make disbursements strictly within the Approved Budget. Borrower shall obtain receipts and revenues in the amounts set forth in the Approved Budget.

**5.7. Milestones.** Borrower shall satisfy the following events (the "Milestones") on or before the date indicated:

(a) Within seven (7) Business Days after the Petition Date, the Interim Order shall have been entered by the Bankruptcy Court.

(b) Within thirty (30) days after the Petition Date, the Final Order shall have been entered by the Bankruptcy Court.

(c) By no later than ten (10) days after entry of the Interim Order, Borrower shall have filed either (i) a motion to approve bidding procedures, which procedures shall expressly recognize Lender's right to bid at any sale and to credit bid up to the entire amount due under the Revolving Credit Facility, and the sale of substantially all Borrower's assets under 11 USC § 363 through one sale, such motion to be in a form and substance acceptable to Lender; or (ii) a motion to approve the sale of substantially all Borrower's assets under 11 USC §363 through one sale to Lender, that expressly recognizes Lender's right to credit bid up the entire amount due under the Revolving Credit Facility against the proposed purchase prices of any such sale, such motion to be in a form and substance acceptable to Lender, and,

(d) By no later than December 31, 2026 Borrower shall have completed and closed the sale of substantially all its assets under 11 USC § 363, and a final order approving such sale or sales shall have been entered by the Bankruptcy Court all in form and substance agreeable to the Lender (the "Sale").

**SECTION 6. BORROWER'S NEGATIVE COVENANTS**

Borrower covenants that until all of the Obligations are paid and satisfied in full under this Agreement:

**6.1. Liens. Borrower shall not (a) execute a negative pledge agreement with any Person covering any Collateral, except as set forth in this Agreement, or (b) cause or permit, voluntarily or involuntarily, or consent to cause or permit (upon the happening of a contingency or otherwise) its Collateral to be subject to any Lien other than the Liens created by this Agreement and any prepetition Liens of record.**

**6.2. Bank and Brokerage Accounts; Deposits. Borrower shall not establish any new deposit, checking, savings, or other similar accounts, or maintain any depository account other than its authorized Debtor-in-Possession accounts.**

**6.3. Hazardous Substances. Borrower shall not cause or permit any Hazardous Substance to be disposed of in any manner which could reasonably be expected to result in any liability to Borrower on, under or at any real property which is operated by Borrower or in which Borrower has any interest.**

**SECTION 7. DEFAULT**

**7.1. Events of Default. Each of the following events shall constitute an event of default ("Event of Default") and Lender shall thereupon have the**

**option to declare the Obligations immediately due and payable, all without demand, notice, presentment or protest or further action of any kind:**

(a) Payments - if Borrower fails to make any payment of principal or interest on the date when such payment is due and payable; or

(b) Other Charges - if Borrower fails to pay any other charges, fees, Expenses or other monetary obligations owing to Lender, whether arising out of or incurred in connection with this Agreement, any other Loan Document or otherwise, on the date when such payment is due and payable, whether upon maturity, acceleration, demand or otherwise, and such failure continues for a period of five (5) days after the earlier of Borrower becoming aware of such failure or Borrower receiving written notice from Lender of such failure; provided however, that the five (5) day grace period shall not be applicable if such payments are due and payable due to maturity, acceleration or demand, whether following an Event of Default, or otherwise; or

(c) Covenant Defaults – if Borrower fails to perform, comply with or observe any covenant or undertaking contained in this Agreement; fails to meet any of the Milestones provided for herein or in any other Loan Document, Authorizing Order, Interim Order or Final Order not otherwise described in this Section 7.1, and such failure continues for a period of ten (10) days after the earlier of Borrower becoming aware of such failure, including by Borrower receiving written notice from Lender of such failure; or

(d) Financial Information - if any statement, report, financial statement or certificate made or delivered by Borrower or any of its shareholders, directors, officers, employees, Affiliates or agents to Lender is not true and correct in all material respects when made; or

(e) Representations or Warranties - if any representation, warranty or other statement by or on behalf of Borrower contained in or pursuant to this Agreement, any of the other Loan Documents or in any document, agreement or instrument furnished in compliance with, relating to or in reference to this Agreement, is false, erroneous or misleading in any material respect when made; or

(f) Bankruptcy – if any of the following shall have occurred in the Bankruptcy Case:

(i) the bringing of a motion or application by Borrower, or the entry of any order by the Bankruptcy Court in the Bankruptcy Case: (A) to obtain additional post-petition financing under Section 364(c) or (d) of the Bankruptcy Code; (B) to grant any super-priority Lien upon or affecting any of the Collateral

which is senior or pari passu with the Post-Petition Liens; or (C) to grant any super-priority administrative expense claim which is senior or pari passu with Lender's claims under the Loan Documents; or

(ii) the bringing of a motion or application by Borrower, or the entry of any order by the Bankruptcy Court in the Bankruptcy Case, to appoint an interim or permanent trustee, receiver of examiner in the Bankruptcy Case;

(iii) the bringing of a motion or application by Borrower, or the entry of any order by the Bankruptcy Court in the Bankruptcy Case, to dismiss or convert the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code;

(iv) the confirmation of any plan of reorganization or liquidation under Chapter 11 of the Bankruptcy Code in the Bankruptcy Case, if it is not acceptable to Lender, in Lender's sole discretion;

(v) the bringing of a motion or application, or the commencement of any proceeding, by Borrower, or the entry of any order by the Bankruptcy Court in the Bankruptcy Case in any proceeding commenced by any other Person, challenging or contesting the validity, extent, perfection or priority of any Liens granted under or obligations arising under the Loan Documents;

(vi) any attempt by Borrower to reduce, avoid, set off or subordinate the Obligations or the Liens securing the Obligations to any other debt;

(vii) the failure of Borrower to perform any of its obligations under the Authorizing Order or any violation of any of the terms of the Authorizing Order, subject to any applicable grace or cure periods set forth therein;

(viii) the Authorizing Order ceases to be in full force and effect for any reason;

(ix) the Post-Petition Liens or Super-Priority Administrative Expense Claim granted with respect to this Agreement cease to be valid, perfected and enforceable in all respects; or

(x) the bringing of a motion or application by Borrower or any Person, or the entry of any order by the Bankruptcy Court in

the Bankruptcy Case, seeking to exercise rights under Section 506(c) of the Bankruptcy Code.

**7.2. <u>Cure</u>. Nothing contained in this Agreement or the Loan Documents shall be deemed to compel Lender to accept a cure of any Event of Default hereunder, except as outlined in Section 7.1 hereof or in the Authorizing Order.**

**7.3. <u>Rights and Remedies on Default</u>.**

(a) In addition to all other rights, options and remedies granted or available to Lender under this Agreement or the Loan Documents, or otherwise available at law or in equity, upon or at any time after the occurrence and during the continuance of an Event of Default or Unmatured Event of Default, Lender may, in its discretion, subject to the Authorizing Order, withhold or cease making Advances.

(b) In addition to all other rights, options and remedies granted or available to Lender under this Agreement or the Loan Documents, or otherwise available at law or in equity, upon or at any time after the occurrence and during the continuance of an Event of Default, Lender may, in its discretion, subject to the Authorizing Order, terminate the Revolving Credit Facility and/or this Agreement.

(c) In addition to all other rights, options and remedies granted or available to Lender under this Agreement or the Loan Documents, or otherwise available at law or in equity, upon or at any time after the occurrence and during the continuance of an Event of Default, Lender may, in its discretion, subject to the Authorizing Order, exercise all rights under the Uniform Commercial Code and any other applicable law or in equity, and under all Loan Documents permitted to be exercised after the occurrence of an Event of Default, including the following rights and remedies (which list is given by way of example and is not intended to be an exhaustive list of all such rights and remedies):

(i) The right to "take possession" of the Collateral, and notify all Account debtors of Lender's security interest in the Accounts and require payment under the Accounts to be made directly to Lender and Lender may, in its own name or in the name of Borrower, exercise all rights of a secured party with respect to the Collateral and collect, sue for and receive payment on all Accounts, and settle, compromise and adjust the same on any terms as may be satisfactory to Lender, in its discretion for any reason or without reason and Lender may do all of the foregoing with or without judicial process (including, without limitation, notifying the United States postal authorities to

redirect mail addressed to Borrower, to an address designated by Lender); or

(ii) Require Borrower, at Borrower's expense, to assemble all or any part of the Collateral and make it available to Lender; or

(iii) The right to reduce or modify the Revolving Credit Commitment, or to modify the terms and conditions upon which Lender may be willing to consider making Advances.

(d) Borrower hereby agrees that a notice received by it at least ten (10) days before the time of any intended public sale or of the time after which any private sale or other disposition of the Collateral is to be made, shall be deemed to be reasonable notice of such sale or other disposition. If permitted by applicable law, any Collateral which threatens to speedily decline in value or which is sold on a recognized market may be sold immediately by Lender without prior notice to Borrower. Borrower covenants and agrees not to interfere with or impose any obstacle to Lender's exercise of its rights and remedies with respect to the Collateral.

**7.4. Nature of Remedies. All rights and remedies granted Lender hereunder and under the Loan Documents, or otherwise available at law or in equity, shall be deemed concurrent and cumulative, and not alternative remedies, and Lender may proceed with any number of remedies at the same time until all Obligations are satisfied in full. The exercise of any one right or remedy shall not be deemed a waiver or release of any other right or remedy, and Lender, upon or at any time after the occurrence and during the continuance of an Event of Default, may proceed against Borrower at any time, under any agreement, with any available remedy and in any order.**

## SECTION 8. MISCELLANEOUS

**8.1. GOVERNING LAW. THIS AGREEMENT, THE OTHER LOAN DOCUMENTS AND ALL RELATED AGREEMENTS AND DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE SUBSTANTIVE LAWS OF THE STATE OF NEBRASKA AND THE UNITED STATES BANKRUPTCY CODE. THE PROVISIONS OF THIS AGREEMENT, THE OTHER LOAN DOCUMENTS AND ALL OTHER AGREEMENTS AND DOCUMENTS REFERRED TO HEREIN ARE TO BE DEEMED SEVERABLE, AND THE INVALIDITY OR UNENFORCEABILITY OF ANY PROVISION SHALL NOT AFFECT OR IMPAIR THE REMAINING PROVISIONS WHICH SHALL CONTINUE IN FULL FORCE AND EFFECT.**

**8.2. Integrated Agreement. The Security Agreement, the Deed of Trust, and the other Loan Documents, all related agreements and this Agreement shall be construed as integrated and complementary of each other and as**

**augmenting and not restricting Lender's rights and remedies. If, after applying the foregoing, an inconsistency still exists, the provisions of this Agreement shall constitute an amendment thereto and shall control.**

**8.3. Waiver and Indemnity.**

(a) No omission or delay by Lender in exercising any right or power under this Agreement or any related agreements and documents will impair such right or power or be construed to be a waiver of any default, or Event of Default or an acquiescence therein, and any single or partial exercise of any such right or power will not preclude other or further exercise thereof or the exercise of any other right, and as to Borrower no waiver will be valid unless in writing and signed by Lender and then only to the extent specified.

(b) Borrower shall indemnify Lender and its directors, officers, employees, agents and Affiliates (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the reasonable fees, charges and disbursements of any counsel for any Indemnitee) incurred by any Indemnitee or asserted against any Indemnitee by any third party arising out of, in connection with or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, (ii) the Loans or the use or proposed use of the proceeds therefrom or (iii) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, and regardless of whether any Indemnitee is a party thereto; provided, that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.

(c) To the fullest extent permitted by applicable law, Borrower shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, the Loans or the use of the proceeds thereof. No Indemnitee referred to in paragraph (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

(d) The agreements in this Section 8.3 shall survive the payment, satisfaction or discharge in full of all the Obligations.

**8.4. Time. Except as otherwise set forth in this Agreement, whenever Borrower shall be required to make any payment, or perform any act, on a day which is not a Business Day, such payment may be made, or such act may be performed, on the next succeeding Business Day. Time is of the essence in Borrower's performance under all provisions of this Agreement and all related agreements and documents.**

**8.5. Expenses of Lender. Borrower shall pay all expenses reasonably incurred by Lender on demand (including, without limitation, search costs, audit fees, inspection fees, appraisal fees and the reasonable fees and expenses of legal counsel for Lender) relating to this Agreement, all related agreements and documents (including, without limitation, expenses incurred in the analysis, negotiation, preparation, closing, administration and enforcement of this Agreement and the other Loan Documents), the Loans and the Collateral, to the extent such expenses are approved by the Bankruptcy Court. In the event of any Event of Default which requires action by Lender in accordance with the terms of the Loan Documents, Borrower shall pay all expenses reasonably incurred by Lender relating to the enforcement, protection and defense of the rights of Lender in and to the Collateral or otherwise hereunder. Additionally, Borrower shall pay all expenses relating to extensions, amendments, modifications, waivers or consents pursuant to the provisions hereof, or any related agreements and documents or relating to agreements with other creditors (including in connection with a Transfer), or termination of this Agreement. The fees, expenses and other costs set forth in this Section 8.5 are collectively referred to as the "Expenses." Any Expenses not paid within thirty (30) days following demand by Lender shall bear interest at the Default Rate.**

**8.6. Notices.**

(a) Any notices, consents or other communications required or permitted by this Agreement shall be in writing and shall be deemed given if delivered in person or if sent by e-mail (with confirmation of receipt), facsimile (with confirmation of receipt) or by nationally recognized overnight courier, or via first class, certified or registered mail, postage prepaid, to the address of such party set forth below, unless such address is changed by written notice hereunder.

Address for notices to Borrower:

Precision Lighting & Electric, LLC
13401 S. 234th Street
Gretna, NE 68028

Attn: Tara Geise
E-mail: ____________
Fax: _________________

Geise Properties 5, LLC
13401 S. 234th Street
Gretna, NE 68028
Attn: Tara Geise
E-mail: ____________
Fax: _________________

With a copy (which shall not constitute notice) to:

Patrick Turner
9375 Burt Street, #200_________________
Omaha, NE 68114_________________
pturner@turnerlegalomaha.com___________
_________________

Address for notices to Lender:

Copper & Current, LLC
_________________
_________________
Attn: ______________
E-mail: ____________

With a copy (which shall not constitute notice) to:

McGrath North Mullin & Kratz, PC LLO
First National Tower, Suite 3700
1601 Dodge Street
Omaha, Nebraska 68102
Attn: Lauren R. Goodman
E-mail: lgoodman@mcgrathnorth.com

(b) Any notice sent by Lender or Borrower by any of the above methods shall be deemed to be given when so received.

(c) Lender shall be fully entitled to rely upon any e-mail or facsimile transmission or other writing purported to be sent by any Authorized Representative (whether requesting an Advance or otherwise) as being genuine and authorized.

**8.7. Headings. The headings of any paragraph or section of this Agreement are for convenience only and shall not be used to interpret any provision of this Agreement.**

**8.8. Survival. All representations, warranties and covenants made by Borrower herein, in any Loan Document or in any agreement referred to herein or on any certificate, document or other instrument delivered by it or on its behalf under this Agreement, shall be considered to have been relied upon by Lender, and shall survive the delivery to Lender of any Loan Document, regardless of any investigation made by Lender or on its behalf. All statements in any such certificate or other instrument prepared and/or delivered for the benefit of Lender shall constitute representations and warranties by Borrower hereunder. Except as otherwise expressly provided herein, all covenants made by Borrower hereunder, in any Loan Document or under any other agreement or instrument shall be deemed continuing until all Obligations are satisfied in full.**

**8.9. Successors and Assigns. This Agreement shall inure to the benefit of and be binding upon the successors and assigns of each of the parties. Borrower may not transfer, assign or delegate any of the duties, rights or obligations hereunder without the prior written consent of the Lender.**

**8.10. Duplicate Originals and Counterparts. Two or more duplicate originals of this Agreement may be signed by the parties, each of which shall be an original but all of which together shall constitute one and the same instrument. This Agreement may be executed in counterparts, all of which counterparts taken together shall constitute one completed fully executed document.**

**8.11. Amendment or Modification. No amendment or modification hereof or of any agreement referred to herein shall be binding or enforceable unless in writing and signed by Borrower and Lender.**

**8.12. Signatories. Each individual signatory hereto represents and warrants that such signatory is duly authorized to execute this Agreement on behalf of such signatory's principal and that such signatory executes the Agreement in such capacity and not as a party.**

**8.13. Third Parties. No rights are intended to be created hereunder, or under any related agreements or documents for the benefit of any third party done, creditor or incidental beneficiary of Borrower. Nothing contained in this**

**Agreement shall be construed as a delegation to Lender of Borrower's duty of performance, including, without limitation, Borrower's duties under any account or contract with any other Person.**

**8.14. <u>WAIVER OF JURY TRIAL</u>. BORROWER AND LENDER HEREBY WAIVE ANY AND ALL RIGHTS THEY MAY HAVE TO A JURY TRIAL IN CONNECTION WITH ANY LITIGATION COMMENCED BY OR AGAINST LENDER WITH RESPECT TO RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO OR UNDER THE LOAN DOCUMENTS, WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE.**

**SECTION 9. NOTICE - WRITTEN AGREEMENTS.**

This notice is provided pursuant to Nebraska Revised Statutes Section 45-1,112 et seq. This Agreement is a credit agreement. A credit agreement must be in writing to be enforceable under Nebraska law. To protect you and us from any misunderstandings or disappointments, any contract, promise, undertaking or offer to forebear repayment of money or to make any other financial accommodation in connection with this loan of money or grant or extension of credit, or any amendment of, cancellation of, waiver of or substitution for any or all of the terms or provisions of any instrument or document executed in connection with this loan of money or grant or extension of credit, must be in writing to be effective.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first set forth above.

**LENDER**:

COPPER & CURRENT, LLC

By: ____________________________
Name: Andrew Schock
Title: Authorized Representative

By: ____________________________
Name: Jasmine Greenwaldt
Title: Authorized Representative

**BORROWER**:

PRECISION LIGHTING AND ELECTRIC, LLC

By: ____________________________
Name: Tara Geise
Title: Authorized Representative

GEISE PROPERTIES 5, LLC

By: ____________________________
Name: Tara Geise
Title: Authorized Representative

# EXHIBIT A

Approved Budget

| Weeks | 11/2/2026 | 11/9/2026 | 11/16/2026 | 11/23/2026 | 11/30/2026 | 12/7/2026 | 12/14/2026 | 12/21/2026 | 12/28/2026 | 1/4/2027 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | |
| Net Sales | $ 152,425.00 | $ 152,425.00 | $ 152,425.00 | $ 152,425.00 | $ 152,425.00 | $ 152,425.00 | $ 152,425.00 | $ 152,425.00 | $ 152,425.00 | $ 154,425.00 | $ 1,526,250.00 |
| Cash Before Exp | $ 152,425.00 | $ 152,425.00 | $ 152,425.00 | $ 152,425.00 | $ 152,425.00 | $ 152,425.00 | $ 152,425.00 | $ 152,425.00 | $ 152,425.00 | $ 154,425.00 | |
| Material/Supplier Payments | $ 50,000.00 | $ 50,000.00 | $ 50,000.00 | $ 50,000.00 | $ 50,000.00 | $ 50,000.00 | $ 50,000.00 | $ 50,000.00 | $ 50,000.00 | $ 50,000.00 | $ 500,000.00 |
| Payroll | $ 70,000.00 | $ 70,000.00 | $ 70,000.00 | $ 70,000.00 | $ 70,000.00 | $ 70,000.00 | $ 70,000.00 | $ 70,000.00 | $ 70,000.00 | $ 70,000.00 | $ 700,000.00 |
| Auto Repairs/Licensing | $ 2,600.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 1,300.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 11,900.00 |
| OPPD/Verizon | $ 4,500.00 | $ - | $ - | $ - | $ 4,500.00 | $ - | $ - | $ - | $ 4,500.00 | $ - | $ 13,500.00 |
| Insurance / WK Comp/Bus | $ - | $ - | $ 35,798.60 | $ - | $ - | $ - | $ 18,000.00 | $ - | $ - | $ - | $ 53,798.60 |
| Insurance / Health | $ 17,000.00 | $ - | $ 17,000.00 | $ - | $ 17,000.00 | $ - | $ - | $ - | $ 17,000.00 | $ - | $ 68,000.00 |
| Office Supplies | $ 500.00 | $ - | $ - | $ - | $ 500.00 | $ - | $ - | $ - | $ 500.00 | $ - | $ 1,500.00 |
| Advertising | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Fuel Expense (Wex Card) | $ 20,000.00 | $ - | $ - | $ - | $ - | $ 20,000.00 | $ - | $ - | $ - | $ 20,000.00 | $ 60,000.00 |
| Credit Card Fees | $ 260.00 | $ 260.00 | $ 260.00 | $ 260.00 | $ 260.00 | $ 260.00 | $ 260.00 | $ 260.00 | $ 260.00 | $ 260.00 | $ 2,600.00 |
| Bank Charges & Check fees | $ 300.00 | $ 300.00 | $ 300.00 | $ 300.00 | $ 300.00 | $ 300.00 | $ 300.00 | $ 300.00 | $ 300.00 | $ 300.00 | $ 3,000.00 |
| Computer/Tsheets/McCormick | $ 800.00 | $ 620.00 | $ 1,100.00 | $ - | $ 800.00 | $ 620.00 | $ 1,100.00 | $ - | $ 800.00 | $ 620.00 | $ 6,460.00 |
| Misc | $ 250.00 | $ 250.00 | $ 250.00 | $ 250.00 | $ 250.00 | $ 250.00 | $ 250.00 | $ 250.00 | $ 250.00 | $ 250.00 | $ 2,500.00 |
| Legal & Accounting | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Interest | $ - | $ 9,200.00 | $ - | $ - | $ - | $ - | $ 9,200.00 | $ - | $ - | $ - | $ 18,400.00 |
| Payroll tax | $ 23,000.00 | $ 23,000.00 | $ 23,000.00 | $ 23,000.00 | $ 23,000.00 | $ 23,000.00 | $ 23,000.00 | $ 23,000.00 | $ 23,000.00 | $ 23,000.00 | $ 230,000.00 |
| Retirement Exp | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 10,000.00 |
| Sales Tax | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Loan Payments (secured loans) | $ 9,710.33 | $ 8,828.86 | $ 6,598.81 | $ 14,389.32 | $ 12,331.21 | $ 11,242.08 | $ 8,632.02 | $ 10,238.85 | $ 16,630.46 | $ 9,740.91 | $ 108,342.85 |
| | | | | | | | | | | | $ - |
| **Net Cash Used** | $ 199,920.33 | $ 164,458.86 | $ 206,307.41 | $ 160,199.32 | $ 180,941.21 | $ 177,972.08 | $ 182,742.02 | $ 156,048.85 | $ 185,240.46 | $ 176,170.91 | $ 1,790,001.45 |
| **Cash Available** | $ (47,495.33) | $ (12,033.86) | $ (53,882.41) | $ (7,774.32) | $ (28,516.21) | $ (25,547.08) | $ (30,317.02) | $ (3,623.85) | $ (32,815.46) | $ (21,745.91) | |

# **EXHIBIT B**

Revolving Credit Note

# REVOLVING CREDIT NOTE

November __, 2026 $300,000.00

FOR VALUE RECEIVED, the undersigned PRECISION LIGHTING & ELECTRIC, LLC, and GEISE PROPERTIES 5, LLC, debtors and debtors-in-possession (together with their respective successors and assigns, the "Borrower"), promises to pay to the order of Copper & Current, LLC (together with its successors and assigns, the "Lender"), the principal sum of Three Hundred Thousand Dollars ($300,000.00) or the unpaid balance of all principal advanced against this Revolving Credit Note (as the same may be amended, restated, modified, supplemented, replaced or refinanced from time to time, the "Revolving Credit Note)"), if that amount is less, together with interest thereon, as specified below.

This Revolving Credit Note is issued under and in accordance with the terms of that certain Debtor-in-Possession Credit Agreement dated of even date herewith among Borrower and Lender (as the same may from time to time be amended, restated, modified or otherwise supplemented, the "Credit Agreement"), and is subject to the provisions and entitled to the benefits of such agreement, including all provisions related to renewal, default, acceleration and remedies. Capitalized terms not defined in this Revolving Credit Note shall have the respective meanings set forth in the Credit Agreement. All obligations of Borrower hereunder shall be payable in immediately available funds in lawful money of the United States of America in the manner specified in Section 2.4 of the Credit Agreement.

Borrower agrees to pay to Lender the Revolving Credit Loans which are evidenced by this Revolving Credit Note on or before the Maturity Date. Borrower may prepay all or any part of the unpaid principal hereunder, without premium or penalty, at any time and reborrow, on a revolving basis, the principal amount available on this Revolving Credit Note, subject to the terms and conditions of the Credit Agreement. Notwithstanding the immediately preceding sentence and subject to the terms and conditions of the Credit Agreement, the Revolving Credit Loans outstanding under this Revolving Credit Note at any one time shall not exceed the Revolving Credit Commitment.

Each Advance made against this Revolving Credit Note, any repayment of principal hereon and the status of each such Advance from time to time shall be recorded by Lender on its books and records. Borrower agrees that in any action or proceeding instituted to collect or enforce collection of this Revolving Credit Note, the entries recorded on the books and records of Lender shall be conclusive evidence of the unpaid principal balance of this Revolving Credit Note and the status of each such Advance from time to time absent manifest error.

Interest shall accrue on the unpaid principal amount of the Revolving Credit Loans at an interest rate equal to ten percent (10.00%) per annum until this Revolving Credit Note is paid in full. Interest shall accrue on the unpaid principal amount of the Revolving Credit Loans on and after the occurrence and during the continuance of an Event of Default at the Default Rate. Interest shall be calculated on the basis of actual days outstanding and a 360-day year. This calculation method results in a higher effective rate than the numeric interest rate stated in this Revolving Credit Note. Borrower shall pay interest in arrears on demand until the Maturity Date (at which time all amounts due hereunder and under the other Loan Dcouments, including interest at the applicable rate(s) shall be due and payable in full notwithstanding any permitted or unpermitted failure of Borrower to make any payment.

If Borrower fails to make any payment of principal or interest on the date due and payable hereunder, or if any other Event of Default occurs under the Credit Agreement, then the entire balance due on this Revolving Credit Note shall at the option of Lender become accelerated and at once due and payable.

This Revolving Credit Note is secured by the Collateral encumbered by the Credit Agreement and other Loan Documents. The obligations, covenants and agreements of the Credit Agreement and each and every of the Loan Documents are hereby made a part of this Revolving Credit Note to the same extent and with the same effect as if they were fully set forth herein, and Borrower does hereby agree to perform and keep each

and every obligation, covenant and agreement set forth in this Revolving Credit Note, the Credit Agreement and the other Loan Documents.

Borrower hereby waives presentment, protest and notice of dishonour and protest and/or non-payment.

Lender shall not be deemed to have waived any of its rights upon or under this Revolving Credit Note, the Credit Agreement or the other Loan Documents, unless such waiver be in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver on any one occasion shall not be construed as a bar to or waiver of any right on any future occasion. All rights and remedies of Lender on liabilities or collateral, whether evidenced hereby or by any other instrument or papers, shall be cumulative and may be exercised singularly or concurrently, subject to any express limitations thereof contained in this Revolving Credit Note, the Credit Agreement or the other Loan Documents.

This Revolving Credit Note shall be construed according to the substantive laws of the State of Nebraska.

Any provision of this Revolving Credit Note which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction. This Revolving Credit Note may be executed in one or more counterparts, each of which shall be deemed an original.

IN WITNESS WHEREOF, Borrower has executed this Revolving Credit Note as of the day and year first set forth above.

**BORROWERS:**

PRECISION LIGHTING & ELECTRIC, LLC

By: ______________________________
Name: Tara Geise
Title: Authorized Representative

Geise Properties 5, LLC

By: ______________________________
Name: Tara Geise
Title: Authorized Representative

## SCHEDULE 2.7(b)(i)

| Year | Make | Model | VIN / Serial # | Plate |
|---|---|---|---|---|
| 2015 | Ram | 5500 | 3C7WRMDL7FG517010 | YLW708 |
| 2016 | Doosan | Air Compressor C185WDZ-T4F | Serial 476798UEAAG07 (PIN 4FVCABAA0GU476798) | |
| 2017 | Finish Line Trailers | 8 X 10 Economy Series Single Axle Utility (E-USR2.5 76/10) | 52WBU1011HR014456 | XVU078 |
| 2005 | Ford | LGT Convtnl F-Super | 3FRNF65E45V111292 | AKY328 |
| 2020 | Chevrolet | Silverado | 1GC4YME79LF320183 | AKY324 |
| 2017 | Chevrolet | City LT | 3N63M0ZN5HK714224 | YYE531 |
| 2019 | Chevrolet | Silverado K1500 | 1GCRYAEH3KZ217691 | AAF624 |
| 2019 | Chevrolet | Express G2500 | 1GCWGAFG0K1228951 | YYA147 |
| 2019 | GMC | Savana | 1GTW7AFG8K1237610 | AAB798 |
| 2019 | GMC | Savana | 1GTW7AFG9K1236157 | AIB184 |
| 2019 | Chevrolet | Express G2500 | 1GCWGAFG0K1365632 | YVW420 |
| 2019 | Chevrolet | Express G2500 | 1GCWGAFGXK1367114 | ASV825 |
| 2015 | Chevrolet | City Express LT | 3N63M0ZN2FK692017 | YLW706 |
| 2018 | Chevrolet | Silverado K2500 | 1GC1KVEG8JF234161 | YVP776 |
| 2019 | GMC | Savana | 1GTW7AFG5K1295125 | YIE379 |
| 2020 | GMC | Savana | 1GTW7AFGXL1181977 | YLU526 |
| 2020 | Chevrolet | Express G2500 | 1GCWGAFG7L1201831 | YVN487 |
| 2022 | Chevrolet | Silverado | 1GB3YSE78NF349150 | YVN488 |
| 2013 | Chevrolet | Express Van G1500 | 1GCSGAFX6D1155831 | AAB796 |
| 2018 | GMC | Savana | 1GTW7AFG8J1910216 | YVP786 |
| 2018 | Chevrolet | Express G2500 | 1GCWGAFG9J1911293 | YYE532 |
| 1957 | Chevrolet | 6400 | 6B57J119479 | YPM552 |
| 1997 | Belshe Trailer | Trailer Flatbed | 16JF01629V1029707 | |

| | | | | |
|---|---|---|---|---|
| 1998 | Chevrolet | C-Series C6H042 | 1GBJ6H1J4WJ104183 | YPM551 |
| 1999 | Ford | SRW Super Duty F250 | 1FTNF21LXXEE79274 | AKY325 |
| 2002 | Ford | F450 | 1FDXF46F72EA31750 | YVN077 |
| 2005 | International | 4000 | 1HTMMAAN85H137706 | AIA486 |
| 2006 | Better Built | 18F 4 Wheels | 4MNDB182561003399 | XVS284 |
| 2008 | Chevrolet | Silverado | 1GBJC34688E126850 | YLW713 |
| 2008 | P.J. Trailer Mfg., Inc. | 40FT - 2 Axle 8 Wheel | 4P5FD362581117898 | XVX771 |
| 2013 | Ram | 5500 | 3C7WRMDL2DG561235 | AWP061 |
| 2013 | H & H | Enclosed Trailer | 533TC162XDC224851 | XVS101 |
| 2017 | Ford | F550 | 1FDUF5GT4HEC34486 | YGM197 |
| 2019 | R & M Trailer Mfg. Inc. | EC 8.5X18 | 55ZR1EG26K1002706 | |
| 2024 | P.J. Trailer Mfg., Inc. | T6222 2 Wheels 2 Axles | 3CV1C2726R2664710 | XXH448 |
| 2019 | Rice | FMEHR8220 | 4RWBE2029KH023926 | XVN602 |

IN THE MATTER OF
Precision Lighting & Electric, LLC, et al.
Case No. BK 26-xxxxx
Motion to Borrow

EXHIBIT B – PROPOSED ORDER

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| In re Precision Lighting & Electric, LLC,<br><br>Debtor. | )<br>)<br>) | Case No. 26-xxxxx<br><br>Chapter 11 |
| In re Geise Properties 5, LLC,<br><br>Debtor. | )<br>)<br>) | Case No. 26-xxxxx<br><br>Chapter 11 |

**INTERIM ORDER GRANTING (A) DEBTORS' JOINT EMERGENCY MOTION FOR ORDERS (I) AUTHORIZING POSTPETITION FINANCING; (II) GRANTING LIENS TO POSTPETITION LENDER; AND (III) SCHEDULING FINAL HEARING; AND (B) DEBTORS' JOINT EMERGENCY MOTION FOR ORDERS AUTHORIZING DEBTORS TO USE CASH COLLATERAL AND GRANTING ADEQUATE PROTECTION PURSUANT TO SECTIONS 361 AND 363 OF THE BANKRUPTCY CODE AND TO SCHEDULE A FINAL HEARING**

THIS MATTER COMES BEFORE THE COURT on

(a) Debtors' Joint Emergency Motion For Orders (I) Authorizing Postpetition Financing; (II) Granting Liens To Postpetition Lender; And (III) Scheduling Final Hearing (the "DIP Motion"), seeking entry of interim and final orders under sections 105, 361, 362, 364(c) and 364(d) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 9013-1 of the Nebraska Rules of Bankruptcy Procedure (the "Local Rules"), authorizing, but not directing, Precision Lighting & Electric, LLC ("Precision") and Geise Properties 5, LLC ("Geise Properties," and together with Precision, the "Debtors") to obtain postpetition financing from Copper & Current, LLC ("Copper") on the terms of the Debtor-In-Possession Credit Agreement attached to the DIP Motion as Exhibit A (the "DIP Agreement"); and

(b) Debtors' Joint Emergency Motion For Orders Authorizing Debtors To Use Cash Collateral And Granting Adequate Protection Pursuant To Sections 361 And 363 Of The Bankruptcy Code And To Schedule A Final Hearing (the "Cash Collateral Motion," and together with the DIP Motion, the "Motions"), seeking entry of interim and final orders under sections 361 and 363 of the Bankruptcy Code and Bankruptcy Rules 4001(b) and 6003 authorizing the Debtors to use Cash Collateral and to grant adequate protection to Dayspring Bank (the "Bank"). The Court, having considered the Motions, the Declaration of Tara Geise in Support of Chapter 11 Petition and First Day Motions (the "First Day Declaration"), and the evidence and arguments presented at the Hearing (as defined below), finds as follows:

**FINDINGS[1],[2]**

A. On November 11, 2026 (the "Petition Date") each Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in this Court.

B. Each Debtor remains in possession of its assets and continues to operate as a debtor-in-possession in accordance with 11 U.S.C. §§ 1107 and 1108.

C. No trustee or examiner has been appointed, and an Official Committee of Unsecured Creditors has not yet been appointed herein. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (D), (K), (M) and (O). This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D. A hearing on the Motions (the "Hearing") was held on November __, 2026. Notice of the Motions and the Hearing was given to the Office of the United States Trustee (the "U.S. Trustee"), the Bank, Copper, all parties known to assert a lien on either Debtor's assets, each Debtor's twenty largest unsecured creditors, and all parties requesting notice. Under the circumstances, such notice constitutes due and sufficient notice of the Motions and the Hearing under Bankruptcy Rules 4001(b), (c) and (d) and the Local Rules.

E. Geise Properties was formed in 2024 and owns the real property located at 13401 South 234th Street, Gretna, Nebraska 68028 (the "Headquarters Property"), which Geise Properties leases to Precision as Precision's operational headquarters and which is also the primary residence of the Debtors' owner and manager, Tara Geise.

F. The evidence presented to this Court at the Hearing indicates that: (i) Precision executed certain promissory notes, loan agreements, security agreements and related documents in favor of the Bank, formerly known as First State Bank, including Loan Nos. 20222815, 20222822, 20250547, 20251282, 20251296 and 20251338, including a Security Agreement dated May 29, 2025, purporting to grant the Bank a security interest in substantially all of Precision's personal property, as reflected in UCC-1 Financing Statement No. 9825574030-3 filed with the Nebraska Secretary of State on May 29, 2025; (ii) Geise Properties executed a Deed of Trust and an Assignment of Leases and Rents, each dated May 29, 2025 and recorded in Sarpy County as Instrument Nos. 2025-10343 and 2025-10344, encumbering the Headquarters Property to secure Loan No. 20251296; and (iii) Geise Properties executed a promissory note in favor of the Bank, Loan No. 20240827, secured by a Deed of Trust and an Assignment of Leases and Rents, each dated May 10, 2024 and recorded in Sarpy County as Instrument Nos. 2024-09840 and 2024-09841, encumbering the Headquarters Property (collectively, the "Prepetition Loan Documents," and the Bank's liens and security interests under the Prepetition Loan Documents, the "Prepetition Liens"). The Bank is the only entity that may assert an interest in either Debtor's cash collateral, as that term is defined in 11 U.S.C. § 363(a) (the "Cash

[1] Nothing herein constitutes a ruling or determination by this Court as to the allowance, validity, or enforceability of any claim, lien, or interest asserted by any party in these cases.

[2] Unless otherwise defined herein, capitalized terms have the meanings given to them in the Motions or the DIP Agreement, as applicable.

Collateral”).

G. The Debtors have an immediate and critical need to obtain the financing provided under the DIP Agreement (the “DIP Financing”) and to use Cash Collateral to fund Precision’s payroll, materials, insurance, vehicle and equipment costs, and other ordinary operating expenses, and to preserve the Headquarters Property, pending the proposed sale of substantially all of the Debtors’ assets to Copper. Absent the relief granted herein, Precision will be unable to make payroll on November 13, 2026, and will be forced to cease operations, resulting in immediate and irreparable harm to the Debtors, their estates and their creditors.

H. The Debtors are unable to obtain unsecured credit allowable under Bankruptcy Code Section 503(b)(1) as an administrative expense, or credit solely under Bankruptcy Code Sections 364(c)(1), (c)(2) or (c)(3). The Bank is unable to provide postpetition financing to the Debtors, and the Debtors are unable to obtain postpetition financing on terms more favorable than those offered by Copper. Copper is not willing to provide the DIP Financing except under the terms set forth in the DIP Agreement and this Interim Order, including the grant of the DIP Superpriority Claim and the DIP Liens (each as defined below).

I. The Bank has consented to: (i) the priming of its Prepetition Liens on Precision’s Accounts (as defined in the DIP Agreement) by the DIP Liens pursuant to Bankruptcy Code Section 364(d)(1); and (ii) the Debtors’ use of Cash Collateral, in each case on the terms and conditions of this Interim Order. Such consent constitutes consent for purposes of Bankruptcy Code Sections 363(c)(2)(A) and 364(d)(1), and the interests of the Bank are adequately protected by the terms of this Interim Order.

J. The DIP Agreement and the DIP Financing have been negotiated in good faith and at arm’s length between the Debtors and Copper, Copper is not an insider or affiliate of either Debtor, and any credit extended or funds advanced to the Debtors by Copper pursuant to the DIP Agreement and this Interim Order shall be deemed to have been extended in good faith, as that term is used in Bankruptcy Code Section 364(e).

K. Pursuant to this Interim Order, the Debtors may use the proceeds of the DIP Financing and Cash Collateral during the Interim Period (as defined below) solely for the purposes and in the amounts set forth in the budget attached hereto as Exhibit A (as amended in accordance with this Interim Order, the “Budget”). The Budget provides for payment of post-petition expenses, including costs and expenses necessary to preserve, maintain and protect the Debtors’ assets, other overhead and expenses in respect of Precision’s continued business, professional fees and expenses, and other expenses related to the administration of these cases.

L. The entry of this Interim Order: (i) will minimize the disruption to Precision’s business that would otherwise result from the filing of the petitions commencing the Debtors’ chapter 11 cases (the “Chapter 11 Cases”); (ii) will preserve the Debtors’ going concern value pending the proposed sale; (iii) is in the best interests of the Debtors, their estates and their creditors; and (iv) is necessary to avoid immediate and irreparable harm to the Debtors’ estates pending a final hearing, within the meaning of Bankruptcy Rules 4001(b)(2), 4001(c)(2) and

6003.

M. Based upon the foregoing, good and sufficient cause exists to grant the Motions on an interim basis.

**Based on the foregoing, and upon the record of the Hearing, it is hereby: ORDERED, ADJUDGED AND DECREED that:**

Approval of the Motions and the DIP Financing

1. The Motions are granted on an interim basis as set forth herein. To the extent not withdrawn or resolved, all objections to the Motions are overruled.

2. The DIP Agreement is approved on an interim basis. Each Debtor is authorized to execute, deliver and perform under the DIP Agreement, the Revolving Credit Note, the Security Agreement, the Deed of Trust (as defined in the DIP Agreement) and the other documents contemplated by the DIP Agreement (collectively, the "DIP Documents"). Upon execution and delivery, the DIP Documents shall constitute valid and binding obligations of each Debtor, enforceable against each Debtor in accordance with their terms and this Interim Order. All Obligations (as defined in the DIP Agreement) of the Debtors under the DIP Documents, which are owed by the Debtors individually and collectively as Borrower under the DIP Agreement, are referred to herein as the "DIP Obligations."

3. The Debtors are immediately authorized upon entry of this Interim Order to borrow from Copper on a revolving basis, pursuant to and subject to the conditions of the DIP Agreement, in an aggregate principal amount outstanding at any time not to exceed $300,000.00 pending the Final Hearing (as defined below), and to pay interest (including interest at the Default Rate), late fees and the other amounts provided for in the DIP Agreement; provided, however, that the attorneys' fees and other Expenses of Copper under Section 8.5 of the DIP Agreement shall be payable only after Copper has provided a summary invoice to the Debtors, the U.S. Trustee and the Bank and no objection has been filed within ten (10) days thereafter, or as otherwise approved by the Court.

4. Subject to the terms of this Interim Order, the Debtors are authorized to use the proceeds of the DIP Financing and Cash Collateral from the Petition Date through the Termination Date (as defined below) (the "Interim Period"), solely for the purposes and in the amounts set forth in the Budget, provided that the Debtors' aggregate disbursements shall not exceed the aggregate budgeted disbursements for the applicable period by more than 120% without the prior written consent of Copper and the Bank. The Debtors shall not use the proceeds of the DIP Financing or Cash Collateral for any other purpose. The Budget may be amended with the written consent of Copper and the Bank, and any amended Budget shall be filed with the Court and served on the U.S. Trustee.

DIP Superpriority Claim

5. With respect to all of the DIP Obligations, Copper hereby is granted, pursuant to Bankruptcy Code Section 364(c)(1), an allowed administrative expense claim against each Debtor's estate having priority over any and all administrative expenses of the kind specified in Bankruptcy Code Sections 503(b) and 507(b) and, upon entry of the Final Order only, Section 506(c) (the "DIP Superpriority Claim"), subject only to the Carve-Out (as defined below). The DIP Superpriority Claim shall be payable from and have recourse to all prepetition and postpetition property of each Debtor and the proceeds thereof, excluding Avoidance Actions (as defined in the DIP Agreement) and the proceeds thereof, and shall not exceed the value of Copper's secured claim in the DIP Collateral (as defined below).

DIP Liens

6. As security for the payment and performance of the DIP Obligations, Copper hereby is granted (effective immediately and without the necessity of the execution or recordation by either Debtor of security agreements, financing statements, deeds of trust or otherwise) valid, enforceable, non-avoidable, and automatically perfected security interests in and liens on the following property of the Debtors' estates and the proceeds thereof (collectively, the "DIP Collateral," and such security interests and liens, the "DIP Liens"):

(a) pursuant to Bankruptcy Code Section 364(c)(2), a valid, binding, perfected, continuing, enforceable, non-avoidable first priority lien on the vehicles owned by Precision and identified on Schedule 2.7(b)(i) to the DIP Agreement (the "Certificated Vehicles"), which are not otherwise subject to a lien;

(b) pursuant to Bankruptcy Code Section 364(c)(3), a junior lien on all other property of each Debtor's estate (other than the Headquarters Property, which is addressed in subparagraph (d) below) that, as of the Petition Date, is subject to a valid, perfected and unavoidable lien (or to a lien perfected after the Petition Date as permitted by Bankruptcy Code Section 546(b)), junior only to such prior existing, prepetition liens and to the Adequate Protection Lien (as defined below) on such property, but excluding any titled vehicle or equipment on which a third party has a lien noted;

(c) pursuant to Bankruptcy Code Section 364(d)(1), a first priority, senior priming lien on all of Precision's Accounts (as defined in the DIP Agreement), whether arising before or after the Petition Date, and the proceeds thereof, which DIP Lien shall be senior to the Prepetition Liens and the Adequate Protection Lien on such Accounts; and

(d) pursuant to Bankruptcy Code Section 364(c)(3), a valid, binding, perfected, continuing, enforceable, non-avoidable lien on the Headquarters Property, owned by Geise Properties, located at 13401 South 234th Street, Gretna, NE 68028, and legally described as Tax Lot 5A 10-13-10 (19.39 A), Sarpy County, Nebraska, junior only to such prior existing, prepetition liens and to the Adequate Protection

Lien (as defined below) on such property including without limitation the Bank's Deed of Trust and Assignment of Leases and Rents dated May 10, 2024, recorded in Sarpy County as Instrument Nos. 2024-09840 and 2024-09841, and the Bank's Deed of Trust and Assignment of Leases and Rents dated May 29, 2025, recorded in Sarpy County as Instrument Nos. 2025-10343 and 2025-10344.

7. The DIP Liens shall: (i) not attach to Avoidance Actions or the proceeds thereof; (ii) be subject only to the Carve-Out and, as to the DIP Collateral described in paragraphs 6(b) and 6(d), the liens to which they are junior; (iii) not be subject to any lien or security interest that is avoided and preserved for the benefit of either Debtor's estate under Bankruptcy Code Section 551; (iv) except as provided herein, not be subordinated to or made pari passu with any other lien or security interest under Bankruptcy Code Section 364(d) or otherwise; and (v) not exceed the value of Copper's secured claim in the DIP Collateral.

8. To the extent that any applicable non-bankruptcy law otherwise would restrict the granting, scope, enforceability, attachment, or perfection of the security interests and liens authorized or created hereby, or otherwise would impose filing or registration requirements with respect thereto, such law hereby is preempted to the maximum extent permitted by the United States Constitution, the Bankruptcy Code, otherwise applicable federal law, and the judicial power of the Bankruptcy Court; provided that Copper may take such steps as it wishes to perfect its security interests and liens under otherwise applicable non-bankruptcy law without waiving the benefits of this provision of this Interim Order, and each Debtor is authorized to execute, deliver, and perform, and do all acts that may be required by Copper in order to perfect such security interests and liens under otherwise applicable non-bankruptcy law.

9. Each Debtor is authorized to do and perform all acts, to make, execute, and deliver all instruments and documents, and to pay fees that may be required or necessary for its performance under the DIP Documents, as provided in and subject to this Interim Order.

Adequate Protection

10. As adequate protection for the priming of the Prepetition Liens on the Accounts and for the Debtors' use of Cash Collateral, and solely to the extent of any diminution in the value of the Bank's interest in its prepetition collateral resulting therefrom, the Bank is granted a replacement lien in each Debtor's post-petition assets of the same kind, and to the same extent, validity and priority, as the Bank's Prepetition Liens on that Debtor's assets were effective and valid as of the Petition Date (the "Adequate Protection Lien"); provided, however, that the Adequate Protection Lien on Precision's Accounts shall be subject and junior to the DIP Liens and the Carve-Out, and the Adequate Protection Lien shall not attach to Avoidance Actions or the proceeds thereof. The Adequate Protection Lien is automatically perfected without the necessity of any further action by the Bank or the Debtors.

11. The Prepetition Loan Documents and the Prepetition Liens shall remain in full force and effect to the same extent such documents and liens were effective and valid as of the Petition Date.

12. The Bank shall have the right to inspect the books and records of the Debtors and to inspect Precision's operations and the Headquarters Property during regular business hours and at such other times as are mutually convenient.

13. The adequate protection provided herein adequately protects the Bank for the priming of its Prepetition Liens on the Accounts, for the Debtors' use of Cash Collateral, and for any diminution in value resulting therefrom during the Interim Period. Nothing herein shall prejudice the right of the Bank to seek additional adequate protection.

Milestones

14. The Debtors shall comply with the following milestones (the "Milestones"), the failure of which shall constitute an Event of Default under the DIP Agreement, subject to the cure period set forth in Section 7.1(c) thereof, and a Termination Event (as defined below):

(a) within thirty (30) days after the Petition Date, a final order approving the DIP Financing and the Debtors' use of Cash Collateral (the "Final Order") shall have been entered;

(b) no later than ten (10) days after entry of this Interim Order, the Debtors shall have filed either: (i) a motion to approve bidding procedures and the sale of substantially all of the Debtors' assets under 11 U.S.C. § 363 through one sale; or (ii) a motion to approve the sale of substantially all of the Debtors' assets under 11 U.S.C. § 363 through one sale to Copper, in either case in form and substance acceptable to Copper and the Bank, and expressly recognizing Copper's right to credit bid up to the entire amount of the DIP Obligations; and

(c) no later than December 28, 2026, the Debtors shall have closed a sale of substantially all of their assets under 11 U.S.C. § 363, and a final order approving such sale shall have been entered, all in form and substance agreeable to Copper and the Bank.

Carve-Out

15. As used in this Interim Order, the "Carve-Out" means: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the U.S. Trustee under 28 U.S.C. § 1930(a), together with any interest thereon under 31 U.S.C. § 3717; (ii) all allowed fees and expenses of professionals retained by either Debtor or any official committee under Bankruptcy Code Sections 327, 328 or 1103 incurred at any time before delivery of a Carve-Out Trigger Notice, to the extent provided for in the Budget; and (iii) allowed fees and expenses of such professionals incurred after delivery of a Carve-Out Trigger Notice in an aggregate amount not to exceed $75,000.00. A "Carve-Out Trigger Notice" means a written notice delivered by Copper following the occurrence and during the continuance of an Event of Default to the Debtors, their counsel, the U.S. Trustee and the Bank, stating that the post-trigger cap in clause (iii) has been invoked. The Carve-Out shall be senior to the DIP Liens, the DIP Superpriority Claim, the Adequate Protection Lien and the Prepetition Liens.

Termination, Remedies and Automatic Stay

16. The Debtors' authority to borrow under the DIP Agreement and to use Cash Collateral shall terminate on the earliest of: (i) the Maturity Date (as defined in the DIP Agreement); (ii) entry of the Final Order or an order denying the Motions on a final basis; and (iii) the expiration of the Remedies Notice Period (as defined below) following the occurrence of an Event of Default under the DIP Agreement or a failure of either Debtor to comply with the terms of this Interim Order (each, a "Termination Event," and the earliest such date, the "Termination Date").

17. The automatic stay created by Bankruptcy Code Section 362 hereby is modified to the extent necessary to permit: (i) the Debtors to grant the DIP Liens, the DIP Superpriority Claim and the Adequate Protection Lien, and to perform such acts as Copper or the Bank may reasonably request to assure the perfection and priority thereof; (ii) Copper and the Bank to file or record any documents evidencing such liens; and (iii) the Debtors and Copper to implement the terms of the DIP Documents and this Interim Order.

18. Upon the occurrence and during the continuance of an Event of Default, Copper may, without further order of the Court, cease making Advances (including upon the occurrence of an Unmatured Event of Default, as defined in the DIP Agreement), accelerate the DIP Obligations, and charge interest at the Default Rate. Copper shall not exercise any other rights or remedies against the DIP Collateral unless Copper has filed with the Court and served on the Debtors, their counsel, the U.S. Trustee and the Bank written notice of the Event of Default and of Copper's intent to exercise remedies, and ten (10) business days have elapsed following such filing and service (the "Remedies Notice Period"). During the Remedies Notice Period, the Debtors and any party in interest may seek an emergency hearing before the Court, at which the only issue shall be whether an Event of Default has occurred and is continuing, and the Debtors may use Cash Collateral solely to pay Precision's payroll and the Carve-Out items provided for in the Budget. Absent an order of the Court to the contrary entered before the expiration of the Remedies Notice Period, the automatic stay shall be modified upon the expiration of the Remedies Notice Period to permit Copper to exercise its rights and remedies under the DIP Documents and applicable law, subject to the Carve-Out.

Other Provisions

19. No proceeds of the DIP Financing, Cash Collateral or the Carve-Out may be used to investigate, prosecute or contest the validity, extent, priority or enforceability of the DIP Obligations, the DIP Liens or the DIP Superpriority Claim, or otherwise to hinder Copper's rights or remedies under the DIP Documents or this Interim Order; provided that nothing herein shall prevent the Debtors from contesting whether an Event of Default has occurred or from complying with this Interim Order or any other order of the Court.

20. Nothing in this Interim Order constitutes a waiver of any rights under Bankruptcy Code Sections 506(c) or 552(b), all of which are reserved pending the Final Hearing.

21. Nothing in this Interim Order constitutes a finding or determination as to the validity, extent, priority or amount of the Prepetition Liens or of any claim of the Bank, and the Debtors and all other parties in interest reserve all rights, claims and defenses with respect thereto.

22. If any provision of this Interim Order is hereafter reversed, modified, vacated or stayed, such reversal, modification, vacatur or stay shall not affect the validity, priority or enforceability of any DIP Obligations incurred before the effective date thereof, which shall be governed in all respects by the original provisions of this Interim Order, and Copper shall be entitled to all of the protections of Bankruptcy Code Section 364(e).

23. The terms of this Interim Order shall survive entry of any order confirming any plan, converting either of the Chapter 11 Cases to a case under a different chapter of the Bankruptcy Code, or dismissing either of the Chapter 11 Cases, and the DIP Liens, the DIP Superpriority Claim and the Adequate Protection Lien shall continue in full force and effect in these and any superseding cases and subsequent to dismissal until the DIP Obligations are paid in full.

24. The DIP Documents and the provisions of this Interim Order shall be binding upon the Debtors, Copper and the Bank and their respective successors and assigns (including any trustee or other representative hereinafter appointed for either Debtor's estate) and shall inure to the benefit of Copper, the Bank and their respective successors and assigns. In the event of any inconsistency between the DIP Documents and this Interim Order, this Interim Order shall control.

Objections and Final Hearing

25. Any party seeking to object to entry of the Final Order must file a written objection (an "Objection") with the Court and serve it on counsel for the Debtors, counsel for Copper, counsel for the Bank and the U.S. Trustee on or before , 2026, at 5:00 p.m. prevailing Central Time.

26. A hearing to consider the Debtors' request for final approval of the Motions shall be held before the undersigned on , 2026 at _.m. prevailing Central Time (the "Final Hearing").

27. The Debtors shall serve a copy of this Interim Order on the parties identified in Finding D within two (2) business days after its entry and shall file a certificate of service.

28. Notwithstanding Bankruptcy Rules 4001(a)(3), 4001(b)(1)(C), 6003, and 6004(h), this Interim Order and the findings of fact and conclusions of law of this Court pursuant to this Interim Order shall be deemed effective upon the entry of this Interim Order. To the extent that such findings may constitute conclusions of law, and vice versa, they hereby are deemed as such.

29. This Court shall, and hereby does, retain jurisdiction with respect to all matters arising from or related to the implementation and interpretation of this Interim Order and to enforce the provisions of this Interim Order.

SO ORDERED THIS ___ DAY OF NOVEMBER, 2026.

Hon.
United States Bankruptcy Judge

Submitted By:
TURNER LEGAL GROUP, LLC
Patrick Turner (NE Bar No. 23461)
9375 Burt Street, #200
Omaha, Nebraska 68114
Telephone: (402) 690-3675
pturner@turnerlegalomaha.com
**Proposed Counsel for Debtors.**

Agreed To By:

[Name], #[_]
[Firm]
[Address]
[Telephone]
[Email]
**Counsel for Dayspring Bank**

Agreed To By:

Lauren R. Goodman, #[_]
McGrath North Mullin & Kratz, PC LLO
First National Tower, Suite 3700
1601 Dodge Street
Omaha, Nebraska 68102
[Telephone]
lgoodman@mcgrathnorth.com
**Counsel for Copper & Current, LLC**

**EXHIBIT A**

**BUDGET**

| Weeks | 11/2/2026 | 11/9/2026 | 11/16/2026 | 11/23/2026 | 11/30/2026 | 12/7/2026 | 12/14/2026 | 12/21/2026 | 12/28/2026 | 1/4/2027 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | |
| Net Sales | $ 152,425.00 | $ 152,425.00 | $ 152,425.00 | $ 152,425.00 | $ 152,425.00 | $ 152,425.00 | $ 152,425.00 | $ 152,425.00 | $ 152,425.00 | $ 154,425.00 | $ 1,526,250.00 |
| Cash Before Exp | $ 152,425.00 | $ 152,425.00 | $ 152,425.00 | $ 152,425.00 | $ 152,425.00 | $ 152,425.00 | $ 152,425.00 | $ 152,425.00 | $ 152,425.00 | $ 154,425.00 | |
| Material/Supplier Payments | $ 50,000.00 | $ 50,000.00 | $ 50,000.00 | $ 50,000.00 | $ 50,000.00 | $ 50,000.00 | $ 50,000.00 | $ 50,000.00 | $ 50,000.00 | $ 50,000.00 | $ 500,000.00 |
| Payroll | $ 70,000.00 | $ 70,000.00 | $ 70,000.00 | $ 70,000.00 | $ 70,000.00 | $ 70,000.00 | $ 70,000.00 | $ 70,000.00 | $ 70,000.00 | $ 70,000.00 | $ 700,000.00 |
| Auto Repairs/Licensing | $ 2,600.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 1,300.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 11,900.00 |
| OPPD/Verizon | $ 4,500.00 | $ - | $ - | $ - | $ 4,500.00 | $ - | $ - | $ - | $ 4,500.00 | $ - | $ 13,500.00 |
| Insurance / WK Comp/Bus | $ - | $ - | $ 35,798.60 | $ - | $ - | $ - | $ 18,000.00 | $ - | $ - | $ - | $ 53,798.60 |
| Insurance / Health | $ 17,000.00 | $ - | $ 17,000.00 | $ - | $ 17,000.00 | $ - | $ - | $ - | $ 17,000.00 | $ - | $ 68,000.00 |
| Office Supplies | $ 500.00 | $ - | $ - | $ - | $ 500.00 | $ - | $ - | $ - | $ 500.00 | $ - | $ 1,500.00 |
| Advertising | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Fuel Expense (Wex Card) | $ 20,000.00 | $ - | $ - | $ - | $ - | $ 20,000.00 | $ - | $ - | $ - | $ 20,000.00 | $ 60,000.00 |
| Credit Card Fees | $ 260.00 | $ 260.00 | $ 260.00 | $ 260.00 | $ 260.00 | $ 260.00 | $ 260.00 | $ 260.00 | $ 260.00 | $ 260.00 | $ 2,600.00 |
| Bank Charges & Check fees | $ 300.00 | $ 300.00 | $ 300.00 | $ 300.00 | $ 300.00 | $ 300.00 | $ 300.00 | $ 300.00 | $ 300.00 | $ 300.00 | $ 3,000.00 |
| Computer/Tsheets/McCormick | $ 800.00 | $ 620.00 | $ 1,100.00 | $ - | $ 800.00 | $ 620.00 | $ 1,100.00 | $ - | $ 800.00 | $ 620.00 | $ 6,460.00 |
| Misc | $ 250.00 | $ 250.00 | $ 250.00 | $ 250.00 | $ 250.00 | $ 250.00 | $ 250.00 | $ 250.00 | $ 250.00 | $ 250.00 | $ 2,500.00 |
| Legal & Accounting | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Interest | $ - | $ 9,200.00 | $ - | $ - | $ - | $ - | $ 9,200.00 | $ - | $ - | $ - | $ 18,400.00 |
| Payroll tax | $ 23,000.00 | $ 23,000.00 | $ 23,000.00 | $ 23,000.00 | $ 23,000.00 | $ 23,000.00 | $ 23,000.00 | $ 23,000.00 | $ 23,000.00 | $ 23,000.00 | $ 230,000.00 |
| Retirement Exp | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 10,000.00 |
| Sales Tax | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Loan Payments (secured loans) | $ 9,710.33 | $ 8,828.86 | $ 6,598.81 | $ 14,389.32 | $ 12,331.21 | $ 11,242.08 | $ 8,632.02 | $ 10,238.85 | $ 16,630.46 | $ 9,740.91 | $ 108,342.85 |
| | | | | | | | | | | | $ - |
| **Net Cash Used** | $ 199,920.33 | $ 164,458.86 | $ 206,307.41 | $ 160,199.32 | $ 180,941.21 | $ 177,972.08 | $ 182,742.02 | $ 156,048.85 | $ 185,240.46 | $ 176,170.91 | $ 1,790,001.45 |
| **Cash Available** | $ (47,495.33) | $ (12,033.86) | $ (53,882.41) | $ (7,774.32) | $ (28,516.21) | $ (25,547.08) | $ (30,317.02) | $ (3,623.85) | $ (32,815.46) | $ (21,745.91) | |